UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**MAXWELL'S PIC-PAC, INC.**                                               **PLAINTIFFS**
**FOOD WITH WINE COALITION, INC.**


**v.**                                                   **CIVIL ACTION NO. 3:11CV-18-H**


**ROBERT VANCE,** *et al.*                                               **DEFENDANTS**

**LIQUOR OUTLET, LLC**                                   **INTERVENING DEFENDANT**

\* \* \* \* \* \* \*

**INTERVENING DEFENDANT'S RESPONSE BRIEF
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Intervening Defendant Liquor Outlet, LLC, d/b/a The Party Source ("Intervening Defendant" or "Party Source"), by counsel, respectfully submits this Response Brief opposing the Motion for Summary Judgment filed by Plaintiffs Maxwell's Pic-Pac, Inc. ("Maxwell's") and Food with Wine Coalition, Inc. ("FWWC").

**I.      INTRODUCTION**

Plaintiffs' Motion and Memorandum in Support ("Plaintiffs' Memorandum") portray Plaintiffs as nothing short of "civil rights" leaders for grocery stores, gas stations, and convenience stores throughout Kentucky in the fight to allow wine and distilled spirits to be sold in these establishments. Plaintiffs even cite to the landmark civil rights case of ***Brown v. Board of Education*** in support of their efforts. Plaintiffs' Memorandum, p. 15. Comparing the impact of KRS 243.230(5) and 804 KAR 4:270, in any way, on retailers such as Kroger and Trader Joe's (who already admittedly sell wine and distilled spirits under existing Kentucky laws and regulations) to centuries old invidious racial discrimination is both laughable and insulting.

While Plaintiffs' Memorandum is full of rhetorical flourishes and argument, it is just as noteworthy for the substantive issues it does not address.  For example, there is no discussion or evidence presented that Plaintiffs have standing to bring this suit.  As presented in Party Source's Motion for Summary Judgment and Memorandum in Support ("Party Source's Memorandum"), FWWC has no associational standing: it does not represent gas stations or convenience stores; its members cannot establish an injury in fact; FWWC has failed to establish that any alleged injury would be redressed by a favorable ruling from the Court, i.e. FWWC's members will get package liquor licenses; and the selling of distilled spirits is not germane to FWWC's purpose. Party Source's Memorandum, pp. 8-11.  Without satisfying the basic procedural prerequisite of standing, Plaintiffs' whole case is for naught and must be dismissed on this basis alone.

Procedural failures aside, Plaintiffs also cannot carry the day substantively.  Plaintiffs' equal protection, due process, and separation of powers claims fail for many reasons that will be discussed below: Plaintiffs ignore the Twenty-first Amendment; there is no heightened equal protection standard applicable to this case; KRS 243.230(5) and 804 KAR 4:270 apply to all retailers; the ABC Board had the authority to promulgate 804 KAR 4:270; Plaintiffs' requested relief would violate the separation of powers doctrine; and Plaintiffs have no valid due process claim.  Moreover, Plaintiffs' Memorandum is replete with misstatements of fact and law and unsupported "facts" that fail their FRCP 56 burden for summary judgment, such as arguing that grocery stores should be viewed the same as "suspect classes" and ignoring decades of alcohol regulation history in Kentucky.

For all of the reasons described in detail below, Plaintiffs have no valid claims and are not entitled to summary judgment. Accordingly, this Court should deny Plaintiffs' Motion.

## II.    LAW & ARGUMENT

### A.    The Plaintiffs' Motion Must Be Denied Because FWWC Failed To Bring Its Claims Within The Applicable Statutes Of Limitation And Neither Plaintiff Has Standing To Maintain The Case.

Party Source has already presented to this Court the reasons why FWWC's claims are barred by the applicable statutes of limitation.  Party Source's Memorandum, pp. 7-8.  On that basis alone, Plaintiffs' Motion should be denied as to FWWC, which should be dismissed as a Plaintiff.

Additionally, both Plaintiffs' claims are barred by their failure to satisfy the Article III standing requirements to bring suit.  Again, Party Source has already presented the Court with the reasons why Plaintiffs' claims are barred by the standing doctrine.  Party Source's Memorandum, pp. 8-12.  On this basis alone, Plaintiffs' Motion should be denied, and the entire case should be dismissed.

### B.    Procedural Defects Aside, Plaintiffs' Motion Must Be Denied Because They Have Failed To Satisfy Their Substantive Burden To Establish Entitlement To Summary Judgment.

In addition to the valid procedural grounds discussed above that mandate denial of Plaintiffs' Motion, Plaintiffs have failed their burden under FRCP 56 to establish grounds for summary judgment in their favor.  FRCP 56 requires a party moving for summary judgment to support the assertions made in its motion through the factual record and the law.  FRCP 56(c) and 56(e).  Unsubstantiated assertions and self-serving conclusions are not proper support for summary judgment.  *Garcia v. Lumacorp, Inc.*, 429 F.3d 549, 555-56 (5th Cir. 2005) (unsubstantiated assertions are not proper evidence supporting summary judgment); *Emmons v. McLaughlin*, 874 F.2d 351, 358 (6th Cir. 1989) (ruling that vague and conclusory allegations in affidavit do not support opposition to summary judgment motion).  Plaintiffs' numerous faulty assumptions, unsubstantiated factual assertions, and reliance on nonapplicable law dooms their

Motion.

        1.      <u>Plaintiffs Make Numerous Faulty Assumptions That Undercut The Validity Of Their Motion.</u>

           a.     *Grocery Stores, Gas Stations, And Convenience Stores Are Not A Protected, Suspect Class.*

Plaintiffs portray themselves, other grocery stores, gas stations, and convenience stores[1] as victims of invidious discrimination because they cannot sell wine and distilled spirits in Kentucky.[2] They take their rhetoric so far as to equate themselves to victims of historical race discrimination by citing ***Brown v. Board of Education*** as their rallying cry. Plaintiffs' Memorandum, pp. 14-15. Plaintiffs also compare themselves to female victims of gender discrimination when they discuss the case of ***Commonwealth of Ky., ABC Bd. v. Burke***, 481 S.W.2d 52 (Ky. 1972). Plaintiffs' Memorandum, pp. 4-6. While such comparisons make for good attempts to elicit the Court's sympathy, they do nothing to prove Plaintiffs' case.

Unlike African-Americans or women, Plaintiffs are not a suspect class subject to protection by existing federal and state civil rights statutes such as Title VII or KRS Chapter 344, the Kentucky Civil Rights Act. ***See*** 42 U.S.C. § 2000e-2; KRS 344.010, *et seq.* Such statutes were enacted to protect the rights of classes of people historically targeted by invidious discrimination because of their race, gender, age, disability, etc. 42 U.S.C. § 2000e-2; KRS 344.040. Grocery stores are not entities that have been subject to invidious discrimination in this country or in the Commonwealth. Grocery stores are not one of the enumerated suspect classes in any federal or Kentucky civil rights statute. ***Id.*** Defendants know of no case of grocery store "discrimination." *See, also*, <u>Exhibit A</u>, Affidavit of Pamela S. Erickson ("Erickson Affidavit"), ¶

---

[1]     Plaintiffs have no standing to represent gas stations and convenience stores in this matter. Party Source's Memorandum, pp. 8-12.

[2]     Plaintiffs, of course, ignore that separate package liquor premises have been established by FWWC members Kroger and Trader Joe's.

8.  Plaintiffs' claims and analogies otherwise make for vivid rhetoric, but do not provide any support for their ultimate goal – striking down KRS 243.230(5) and 804 KAR 4:270.[3]

        b.      *Plaintiffs Disregard The Importance Of The History Of Valid Alcohol Regulation In Kentucky To This Case.*

Plaintiffs start their Memorandum by posing a question about why wine and distilled spirits can be sold by package liquor stores and drug stores, but not by grocery stores.  They repeatedly argue throughout the Memorandum that every other Kentucky retailer can, in fact, receive a package liquor license except for grocery stores (and gas stations and convenience stores).  Plaintiffs even state that there is "no legislative history shedding light on why [KRS 243.230(5)] was enacted in 1944."  Plaintiffs' Memorandum, p. 11.  Presumably, Plaintiffs' point from all of this is that there is no legislative history for the prohibition against the sale of wine and distilled spirits sales by retailers such as themselves.  On the contrary, there is history detailing the rationale behind Kentucky's alcohol regulation which is part of the record, including the prohibition against grocery stores selling wine and distilled spirits.

Party Source has already presented to this Court a short history of the origins of alcohol regulation in Kentucky after Prohibition including the 1933 Report of the Kentucky Liquor Control Committee.  Party Source's Memorandum, pp. 3-4, Exhibits 10-11.[4]  The Liquor Control Committee Report and the two draft alcohol regulation bills that it proposed are persuasive evidence of the rationale behind the enactment of alcohol regulation laws in Kentucky at the time the regulatory scheme was considered after Prohibition.

There is no debate that the entire Committee agreed that alcohol must be regulated and excessive drinking must be curbed to the extent possible.  Party Source's Memorandum, p. 4,

---

[3]      Plaintiffs brought no discrimination claim in their Amended Complaint.  Docket No. 37.

[4]      Party Source's Exhibits 1-22 were filed with its Memorandum on January 6, 2012.  Docket No. 40.  New Exhibits will be designated by letters and will be filed with this Response Brief.

Exhibit 10, pp. 4-5, 13.  This specifically included what types of and where alcohol could be sold.  *Id.*, pp. 7-8, 10-11, 13-16.  Besides the "social evils" that needed to be eliminated in the view of the Committee (*Id.*, pp. 4-5, 7-8, 10-11, 13), one cannot forget the real health issues to be combated that result from over consumption.  Erickson Affidavit, ¶¶ 9-10.

Starting from the same goals, however, it is obvious that the Committee's majority and minority reports reached different conclusions as to the "what" and "where" questions regarding alcohol sales.  Exhibit 10.  The majority wanted to remove "those inducements to excessive drinking which attend secret and illicit drinking" by "bring[ing] the supply of liquor out into the daylight, where it can be properly restricted and watched and policed and taxed."  *Id.*, p. 5. While the majority did not identify retailers that would be specifically prohibited from selling alcohol, it did propose a package liquor retail system using heavy taxation of alcohol licensing to discourage both consumption and sales: "[o]n the retail side particularly, it employs the power of taxation, not merely to raise revenue, but also, and primarily, to restrict trade in the interest of social welfare."  *Id.*, p. 7.  For example, in the majority's proposed bill, a package liquor license would have cost a retailer in a first class city (i.e. Louisville) $750.00 annually.  *Id.*, p. 19.  That may not seem a high tax at first blush, but that equates to over $12,600.00 in today's dollars, comparing the inflation of the license fee from 1934 to today.[5]  Exhibit B, CPI Inflation Calculator.  When taking into account inflation it is clear that retailers were going to pay a steep, possibly cost-prohibitive price for the privilege of selling alcohol.

The minority report did not propose a package liquor system *per se*.  The minority did specifically consider the sale of alcohol in grocery stores.  However, the minority report limited such sales to light alcohol beverages - beer and wine with alcohol percentage caps.  Exhibit 10,

---

[5]     Exhibit B was calculated at and printed from the U.S. Department of Labor, Bureau of Labor Statistics website: http://www.bls.gov/data/inflation_calculator.htm.

pp. 13-15.  For off premises sales of light alcohol beverages, the minority report proposed limiting such sales only to grocery stores or drug stores.  *Id.*, p. 42-43.  Under the minority report, no distilled spirits could be sold at retail.  *Id.*, pp. 13-15.

In 1938, the General Assembly finally passed a comprehensive Alcohol Beverage Control Law.  The majority proposal won out regarding a system of package stores, but the law was consistent with the basic goals of the entire Committee.  Grocery stores were not eligible for retail package liquor licenses – no wine or distilled spirits could be sold in grocery stores.  Exhibit 11, pp. 101-103.  This same prohibition exists today.

It should also be noted that the basic model for selling high alcohol content products in retail outlets with greater control is used in some way by virtually every state.  Erickson Affidavit, ¶ 17.  Nevertheless, no state fits perfectly into the model and all states have modified these systems over the years.  *Id.*  In addition, retail outlets frequently change their business models, add new product lines, and modify sales methods.  *Id.*  It is often difficult for a regulatory system to keep pace with the changes.  *Id.*  This does not mean that the basic idea to regulate alcohol is no longer reasonable or valid.  *Id.*  In every state, alcohol systems create exceptions that attempt to balance business and customer needs with measures needed to control alcohol problems.  *Id.*

Contrary to Plaintiffs' assertions, Kentucky's statutory alcohol regulation, including KRS 243.230(5), did not arise from an unknown historical vacuum.  There is evidence before the Court showing the origins of alcohol regulation after Prohibition, including the goals and rationales.  When looking at those origins, it is clear that alcohol was never intended to be treated as every other consumer product, was not intended to be sold by every retailer, and was not

intended to include every type of alcohol.[6]  To argue otherwise is merely willful ignorance of the historical record.

        c.    *Plaintiffs' Argument That Every Other Retailer Can Get A Package Liquor License Is A Fallacy.*

Plaintiffs' argument that <u>every</u> retailer can receive a retail package liquor license except grocery stores and gas stations ignores factual and legal reality.  Plaintiffs mention multiple times in their Memorandum that retailers who primarily sell things such as guns and toys can receive a package liquor license.  Plaintiffs' Memorandum, pp. 1, 6, 13.  Assuming for the sake of argument that were true under KRS 243.230(5), Plaintiffs utterly fail to acknowledge the other regulatory or practical roadblocks to their proposition that Toys "R" Us or any gun store can be selling wine and distilled spirits next to teddy bears and revolvers, respectively.

Two examples of other regulatory roadblocks are readily apparent.  First, the quota system caps the number of package liquor licenses.  KRS 241.065.  In places at or over quota, toy and gun stores (or any other retailer) would be out of luck.  Second, and more important, ABC has the discretion to refuse the issuance of a license to <u>any</u> applicant:

> A license that might be issued under KRS 243.020 to 243.670 may be refused by a state director for any reason which the director, in the exercise of his or her sound discretion, deems sufficient. Among those factors that the director shall consider in the exercise of his or her discretion are: public sentiment in the area; number of licensed outlets in the area; potential for future growth; type of area

---

[6]      In considering the question of equal protection based on classifications of alcohol retailers, ***Ry. Express Agency v. People of State of N.Y.***, 336 U.S. 106 (1948), is instructive.  In that case, appellant had been convicted of violating a New York City ordinance banning the placement of advertisements on vehicles unrelated to the vehicle owners' business (i.e. selling advertising space on the vehicle to a third party).  ***Id.*** at 107-108.  Appellant claimed that such unequal treatment by classifying advertisements between the products sold by the owner and general advertisements violated the Equal Protection Clause.  ***Id.*** at 109.  The Court dismissed the appellant's argument, agreeing that the State could regulate based on such a classification: "[w]e cannot say that that judgment is not an allowable one.  Yet if it is, the classification has relation to the purpose for which it is made and does not contain the kind of discrimination against which the Equal Protection Clause affords protection.  It is by such practical considerations based on experience rather than by theoretical inconsistencies that the question of equal protection is to be answered.  And the fact that New York City sees fit to eliminate from traffic this kind of distraction but does not touch what may be even greater ones in a different category, such as the vivid displays on Times Square, is immaterial.  It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." ***Id.*** at 110 (internal citations omitted).

involved; type of transportation available; and financial potential of the area. KRS 243.450(2). Other regulations applicable to the "toy store" or "gun store" as package liquor store example, such as restrictions of minors on the premises (KRS 244.085(7)) and the age of employees checking out the customer buying his Legos, guns, and vodka (KRS 244.087), also would provide a hindrance. *See*, also, the discretion granted the decision makers under KRS 243.450(2).

For purposes of summary judgment, Plaintiffs have not presented proof that toy stores, gun stores, hardware stores, furniture stores, Hallmark stores, etc. have ever sought, intend to seek, or have obtained a package liquor license in Kentucky. Nor do Plaintiffs offer evidence that if such retailers applied for package liquor licenses, they would receive one from ABC. Do Plaintiffs really believe that the ABC Board would license any retailer to sell alcohol? In reality, this Court can take judicial notice pursuant to FRE 201 that Toys "R" Us, Home Depot, Lowe's, Ashley Furniture, and Hallmark do not sell alcohol on their premises. Reliance on a discussion of such retailers hypothetically selling alcohol does not advance Plaintiffs' case, and it does not meet the Plaintiffs' summary judgment burden.

    d.     *Plaintiffs' Attack On The Sale Of Wine And Distilled Spirits By Drug Stores Fails To Acknowledge That Drug Stores Have Always Been Involved In The Retail Liquor Business.*

Plaintiffs spend an inordinate amount of time in their Memorandum extolling drug stores' supposed privileged position as liquor retailers in the Commonwealth due to their ability to sell wine and distilled spirits.[7] The issue cannot be that drug stores have recently entered the alcohol business. Drug stores were actually in the alcohol business well-before package liquor stores or grocery stores (selling malt beverages only). The Liquor Control Committee Report identified

---

[7]     Presumably drug stores, especially the local drug stores that have virtually disappeared from existence, rejoiced when grocery stores such as Kroger, decided to get into the drug store business by opening their own pharmacies and "Little Clinics."

one of the biggest problems of alcohol use during Prohibition as "the easy druggist," the bootlegger's biggest competitor, selling alcohol.  Exhibit 10, p. 4.  This resulted from the drug store being a dispensary of alcohol "for medicinal purposes"; in reality, people merely obtained and filled prescriptions so that they could drink.  *Id.*, pp. 5-6.  Drug stores were not a small player in the liquor business during Prohibition.  In 1931 and 1932, drug stores dispensed 32,000 gallons of liquor on average in Kentucky.  *Id.*, p. 6.[8]

The majority proposal allowed the drug store to continue its role as an alcohol retailer by paying the appropriate license fee.  *Id.*, pp. 6-7, 19-20.  Even though the minority proposal would have prohibited the sale of "intoxicating liquors" (distilled spirits) by all retailers, it would have permitted drug stores to sell intoxicating liquors without a prescription (one pint per week) and dispense them without limit with a prescription.  *Id.*, pp. 14-15.  It also would have allowed drug stores to sell beer and wine, which would have been in direct competition with grocery stores.  *Id.*, pp. 42-43.

Plaintiffs act as if the sale of alcohol by drug stores is a new phenomenon and a recent exception to the package liquor store model.  That is not the case.  Plaintiffs' notion that drug stores are beating grocery stores to the punch in the alcohol sales business fails to understand the historical context of alcohol sales – drug stores have always sold alcohol.  Moreover, so long as they satisfy KRS 243.230(5), it is reasonable for drug stores to hold package liquor licenses given their long experience with selling alcohol and their expertise in selling highly controlled products.  Erickson Affidavit, ¶¶ 14-15.

> 2.    Plaintiffs Are Wrong On Many Of Their "Facts" Offered In Support Of Their Motion.

FRCP 56(c) makes clear that a party moving for summary judgment must support its

---

[8]     To put that amount in some perspective, 32,000 gallons equals 4,096,000 ounces (one gallon equals 128

motion through citation to actual materials of record.   FRCP 56(c)(1)(A).   It is not sufficient to merely offer self-serving conclusions based on no record evidence.   *Garcia*, 429 F.3d at 555-56; *Emmons*, 874 F.2d at 358.   Throughout their Memorandum, Plaintiffs make numerous unsupported statements that must be disregarded:

    i.    Plaintiffs state that grocery stores "already sell beer, malt liquor, and other alcohol beverages along with groceries."   Plaintiffs' Memorandum, pp. 6-7.   This is misleading.   The only alcoholic beverages grocery stores can sell today are those qualifying for a malt beverage license.   There is no "other alcohol" license.   Thus, grocery stores are not selling "other alcohol beverages."

    ii.    Plaintiffs claim that the General Assembly must believe that "the sale of groceries with alcohol as being a good thing" because KRS 243.280 requires a gas station selling malt beverages to maintain a statutorily-set dollar amount of inventory for food, groceries, and related products.   Plaintiffs' Memorandum, pp. 7-8.   The issue is not the desirability of selling alcohol and groceries together.   Instead, the issue is that, in effect, gas stations have to maintain a convenience store to sell malt beverages.   Clearly, the General Assembly did not want gas stations and repair shops to sell malt beverages without such a commercial related enterprise (Jiffy Lube does not sell malt beverages; car dealers and auto body shops do not sell malt beverages).   Following Plaintiffs' logic, the most that

---

ounces).  This converts to 341,333 bottles of twelve ounce beer, or 14,222 cases of beer.  In terms of distilled spirits, 4,096,000 ounces converts to approximately 121,133 liters (1 ounce equals 0.2957 liters) of spirits.

can be said for the relation of alcohol and groceries is that the General Assembly has approved the sale of malt beverages and groceries together, <u>not</u> all alcohol with the sale of groceries.

iii.    Plaintiffs claim to have "no doubt that current package wine and liquor licensees such as Party Source mounted a full-court lobbying blitz to defeat FWWC's recent legislative efforts, and the licensees were obviously successful doing so." Plaintiffs' Memorandum, p. 9. But Plaintiffs have presented no evidence of any "lobbying blitz." Surely if FWWC has evidence of such a blitz, its Executive Director and hired lobbyist, Ted Mason, would have provided it. It is not surprising there is no such evidence presented since Mr. Mason could not recall the details of FWWC's lobbying efforts that he oversaw. <u>Exhibit C</u>, Mason Deposition, 54:25-56:25 (cannot identify proposed wine license bill submitted to General Assembly), 60:1-19 (cannot recall why Maxwell's was FWWC member chosen to be Plaintiff), 62:23-65:7 (no recollection of the details of the petition drive that he spearheaded).[9]

iv.    Plaintiffs' attempt to argue that the potency of all alcohol is equivalent does not pass any common sense test. Plaintiffs' Memorandum, p. 12. Using round numbers, no one can argue with a straight face that the potency of one ounce of beer/malt beverage

---

[9]    Because Party Source is citing to portions of Mr. Mason's deposition, as well as Mr. Maxwell's, in this Response that were not submitted with its Memorandum, it will file all cited transcript portions in this Response as separate Exhibits herewith.

(five percent alcohol), is equivalent to one ounce of wine (twelve percent alcohol), is equivalent to one ounce of distilled spirits (forty percent alcohol). Plaintiffs cannot deny that this basic fact is common knowledge. *See, also*, Erickson Affidavit, ¶ 12.

v.   Plaintiffs state that "for purposes of this case, the only effective difference between a Walgreens and Food City is that a Walgreens does not sell as many groceries as a Food City." Plaintiffs' Memorandum, p. 13. Anyone who has been in a chain drug store and a chain grocery store knows that there are more differences than the amount of groceries sold. Legally, in relation to Kentucky alcohol regulation, there are significant historic differences as already discussed above. Factually, today's chain grocery stores are more than just groceries – they include coffee shops and seating areas for customers, dry cleaners, rental car counters, and wine bars. Erickson Affidavit, ¶¶ 5, 13, 18, and attached Exhibits 1(a)-(c), 1(h)-(i).[10] Those are "departments" that are not part of drug stores.

vi.   Plaintiffs are correct that the General Assembly's refusal to amend KRS 243.230(5) does not by itself make the statute (or 804 KAR 4:270) constitutional. Plaintiffs' Memorandum, p. 13. What it certainly does indicate is that the General Assembly and the citizens it represents have no interest in changing the prohibition

---

[10]   The Fry's Food Stores at which Ms. Erickson took pictures are part of the Kroger Co. *See* http://www.thekrogerco.com/

against wine and distilled spirits being sold in grocery stores by adopting FWWC's proposed wine license legislation. <u>Exhibit 12</u>. Moreover, even FWWC's Executive Director and lobbyist recognizes the lack of public and legislative support for any such change to the prohibition in KRS 243.230(5). *Id.*.

vii.   Plaintiffs' attempt to portray their case as one for the "little guys," the "hundreds of independent grocery stores and convenience stores throughout Kentucky . . ." Plaintiffs' Memorandum, p. 19. Plaintiffs have presented no evidence that they represent any of those "little" stores. None of the little guys are members of FWWC. In fact, other than Maxwell's, the token "one-location" grocery store, the other members of FWWC are all chain stores. <u>Exhibit 13</u>. Yet, Maxwell's is not a true "one-location" store. Dave Maxwell has an ownership interest in a total of three (3) Pic-Pac stores. <u>Exhibit D</u>, Maxwell Deposition, 5:8-6:10, 8:4-15. Not only does Plaintiffs' refrain of protecting "the little guys" ring hollow, it again raises the issue of associational standing since none of those independent stores are FWWC members.

viii.   Plaintiffs criticize Party Source for negotiating and obtaining bulk discounts on wine and liquor. Plaintiffs' Memorandum, p. 20. They cite to no evidence of record to support their statements. In further response, Party Source directs the Court's attention to Exhibit K to Plaintiffs' Memorandum. The Exhibit is a Kroger store and location count showing that Kroger has 2460 stores.

14

Party Source would submit that Kroger's negotiation and bulk discount power exponentially exceeds any Kentucky package store.

ix.   Plaintiffs claim "there is absolutely no proof that self-service checkouts do not effectively prevent sales of alcohol to minors and intoxicated persons." Plaintiffs' Memorandum, p. 24. Party Source has submitted evidence into the record of the problems with self-checkout machines, especially the swipe and switch method, which Plaintiffs do not address. *See, e.g.*, Exhibit 3, ¶ 18; Exhibit 16, p. 12; Exhibit 22. Problems with self-checkouts have led to the ban of self-checkouts for alcohol sales in California. Exhibit E, October 11, 2011 L.A. Times Article. Plaintiffs also claim that Kentucky grocers "have been selling beer and malt beverages through self-service checkouts since they came on-line in the late 1990s and early 2000s." Plaintiffs' Memorandum, p. 24. But there is no record evidence as to which grocers have been doing so since that time, for how long, and that they have had no problems with alcohol purchases by minors.

x.   Plaintiffs also claim that other retailers such as drug stores can start selling alcohol through self-checkouts tomorrow. Plaintiffs' Memorandum, p. 26. But they provide no evidence that is going to happen tomorrow, next week, next month, or next year in Kentucky. Rather, Plaintiffs just submit an article about certain CVS pharmacies in Boston starting to use self-checkouts.

Plaintiffs then assert that Home Depot and Lowe's just need to get package liquor licenses to start selling alcohol through their self-checkouts since nothing is stopping them from doing so. Plaintiffs' Memorandum, p. 26.   The ridiculousness of Home Depot and Lowe's seeking liquor licenses and selling alcohol is obvious on its face and has already been discussed above.

xi.    Plaintiffs argue that it is "extremely burdensome" for a grocery store (or convenience store) to establish a separate package liquor store.  Plaintiffs' Memorandum, p. 27.  Other than self-serving conclusions, they offer no proof of any of the "burdens" of doing so.   Clearly Kroger and Trader Joe's do not think it is overly burdensome to do so.  Exhibit 13.  In fact, it appears that Kroger has made doing so part of its business plan in Kentucky as evidenced by the sheer number of package stores it has opened and now operates.  Exhibit 14.  Furthermore, if KRS 243.230(5) would be struck down, any concerns regarding future Kentucky consumer bombardment by alcohol advertising and easily accessible alcohol in grocery stores alone are valid.  One just has to look to other states or countries that allow the sale of wine and distilled spirits in grocery stores to see what will happen - grocery stores will construct in-store advertisements and product placements throughout the entirety of the store. Erickson Affidavit, ¶¶ 5-6(i)-(v) and attached Exhibits 1(b), 1(d)-(i).  If Kroger is doing so in its Fry's Food Stores in Arizona (Erickson Affidavit, attached

16

Exhibits 1(b), 1(f)-(i)), there is no reason to think it will not do the same in Kentucky.

xii.   There is no evidence presented that grocery stores are at a "competitive disadvantage" (Plaintiffs' Memorandum, pp. 27-28) because consumers allegedly prefer buying their milk, eggs, and vodka from a drug store in one transaction, rather than two transactions at a grocery store and a liquor store, even if that liquor store is owned by the grocery store and is next door to the grocery store premises.

xiii.   Plaintiffs claim that "members of the Coalition . . . do not anticipate that the sale of wine and liquor will result in any of their premises' alcoholic beverage sales exceeding fifty percent (50%) of their gross sales," citing the Affidavit of Neil Wellinghurst. Plaintiffs' Memorandum, p. 29.  Mr. Wellinghurst can only speak for Kroger, which will always sell groceries.  He cannot speak for other FWWC members or the supposed hundreds of independent grocers in Kentucky.  Plaintiffs offer no other proof for their speculation.

3.   <u>Plaintiffs Are Wrong On The Law.</u>

a.   *While The State's Power Under The Twenty-First Amendment Is Not Unlimited, It Does Control In This Case.*

Plaintiffs spend less than a page of their forty (40) page Memorandum arguing that the Twenty-first Amendment does not trump the other parts of the Constitution involved in this case: the Equal Protection and Due Process Clauses.  Plaintiffs' Memorandum, p. 30.  Plaintiffs are

correct that the Twenty-first Amendment must be construed in conjunction with the rest of the Constitution. *Granholm* taught that lesson as it pertains to the interaction between the Twenty-first Amendment and the dormant Commerce Clause. *Granholm v. Heald*, 544 U.S. 460, 486 (2005).

However, the reverse is also true: other parts of the Constitution do not necessarily trump the Twenty-first Amendment. *Simms v. Farris*, 657 F. Supp. 119, 123-124 (E.D. Ky. 1987), *aff'd*, 840 F.2d 18 (6th Cir. 1988); *Temperance League of Ky. v. Perry*, 74 S.W.3d 730, 733 (Ky. 2002); *Beacon Liquors v. Martin*, 279 Ky. 468, 131 S.W.2d 446, 449 (Ky. 1939). Instead, the facts of each Twenty-first Amendment case have to be viewed through the appropriate lens of constitutional review to determine the issue at hand. *Simms*, 657 F. Supp. at 123. Here, the question is whether under the rational basis test the prohibition against grocery stores (not members of any protected class) selling wine and distilled spirits (a non-constitutional right) under the Commonwealth's Twenty-first Amendment power to regulate alcohol is a violation of grocery stores' equal protection or due process "rights"? The answer under the law is a resounding, "No."

In this case, involving a State's regulation of alcohol within its borders, the Court cannot allow the Plaintiffs to let it lose sight of the importance and purpose of the Twenty-first Amendment. The Amendment was enacted to recognize the failed experiment of the federal prohibition of alcohol and that the states were in the best position to decide how to regulate alcohol within their borders. Such powers include the absolute prohibition of alcohol's manufacture, transportation, sale or use. *Ziffrin v. Reeves*, 308 U.S. 132, 138 (1939), abrogated by *Granholm*, 544 U.S. 460 (2005). This was because the Court made clear that "[t]he state may protect her people against evil incident to intoxicants. . ." *Id.* at 138-39.

Since the enactment of the Twenty-first Amendment, the courts have consistently

recognized that the States' legislatures have exclusive control over alcohol regulation within their borders especially since the sale and distribution of alcohol is not a protected constitutional right:

> It has been held that the right to sell intoxicating liquors is not an inalienable or constitutional right.  And, subject to any constitutional limitation, it is within the power of the states to forbid the traffic altogether or to regulate it by means of licenses.  The validity of the state's exercise of its police power in regulating the sale of spiritous liquors, therefore, does not depend upon the question of the presence or absence of discrimination for or against particular persons or classes.  There seems to be universal acquiescence in this view.

*Fuson v. Howard*, 305 Ky. 843, 205 S.W.2d 1018, 1020-21 (1947).

Kentucky courts have long acknowledged that the Twenty-first Amendment gives states power to regulate the sale of alcohol within its borders.  ***Blue Movies, Inc. v. Louisville/Jefferson County Metro Gov't***, 317 S.W.3d 23, 34 (Ky. 2010), relying on ***N.Y. State Liquor Auth. v. Bellanca***, 452 U.S. 714, 715 (1981) ("This Court has long recognized that a State has absolute power under the Twenty-first Amendment to prohibit totally the sale of liquor within its boundaries.  It is equally well established that a State has broad power under the Twenty-first Amendment to regulate the times, places, and circumstances under which liquor may be sold.").

The courts have also dealt with the issue of equal protection interacting with the Twenty-first Amendment as alcohol regulations pertain to which retailers can sell alcohol, including grocery stores:

> **We are asked why the legislature did not put restaurants in the same class as hotels, and grocery stores in the same class as drug stores, and permit them to sell liquor.  Our answer is, it is within the province of the legislature to make such classification as it deems best under its police power, and we are not concerned with the wisdom of the Act of the legislature, but only with its constitutionality.  If that classification is not so arbitrary as to be unreasonable, and is put upon a rational basis which is calculated to accomplish the protection of the public safety, health, or morals, the courts cannot interfere with it**.

*Beacon Liquors*, 131 S.W.2d at 449 (emphasis added). Moreover, the Kentucky Supreme Court has already indicated that "[g]iven the unique nature of the regulation and licensing of the sale of alcoholic beverages, almost any content-neutral, legislative classification based on the types of businesses or organizations eligible to sell alcoholic beverages" would not violate equal protection concerns. *Temperance League*, 74 S.W.3d at 733.

The Kentucky federal courts have also examined the interplay of the Equal Protection Clause and Twenty-first Amendment. In fact, the courts have examined KRS 243.230 before and found that it did not violate the Equal Protection Clause: "**there exists a rational basis for the statute [KRS 243.230], namely the need to regulate establishments serving alcoholic beverages. Therefore, plaintiffs' substantive due process and equal protection attacks fail**." *Simms*, 657 F.Supp. at 123.

In the instant case, the General Assembly has treated all potential applicants equally. Even if not, it has decided that those who choose to hold themselves out as sellers of staple groceries or gas and oil, without limitation, must decide in which business they will focus their finances and attention. This was a valid exercise of the Commonwealth's power under the Twenty-first Amendment. There is no denial of equal protection or due process of the laws.

        b.    *No "Heightened" Equal Protection Standard Applies To This Case.*

Plaintiffs claim that KRS 243.230(5), a "facially discriminatory provision," violates Kentucky's heightened standard of equal protection owed to Plaintiffs. Plaintiffs Memorandum, pp. 10-11. What Plaintiffs do not understand is that there is no heightened degree of equal protection applicable in this situation because they misread the cases upon which they rely for their argument.

Plaintiffs trumpet *Elk Horn Coal Corp. v. Cheyenne Res., Inc.*, 163 S.W.3d 408, 418-

419 (Ky. 2005), for the proposition that Kentucky courts apply a heightened equal protection test to cases involving social and economic policy. Plaintiffs' Memorandum, pp. 10-11. To understand that is not the case here, one has to review the entire relevant section from *Elk Horn*:

> Many [states] have general protection against "arbitrary power" as we have in Kentucky Constitution § 2, and guarantees of "equal" rights and protection against "grant" of "separate . . . privileges" as we have in Kentucky Constitution § 3. **But few have additional protection against local and special legislation as we have in Kentucky Constitution § 59**. So far as we can determine, none has anything like the combination of broad constitutional protection of individual rights against legislative interference vouchsafed by our 1891 Kentucky Constitution.
>
> **Because of this additional protection, we have elected at times** to apply a guarantee of individual rights in equal protection cases that is higher than the minimum guaranteed by the Federal Constitution. Instead of requiring a "rational basis," we have construed our Constitution as requiring a "reasonable basis" or a "substantial and justifiable reason" for discriminatory legislation in areas of social and economic policy. **Cases applying the heightened standard are limited to the particular facts of those cases.** We need not decide, however, whether the facts of this case require us to invoke Kentucky's heightened standard because we hold that KRS 26A.300 fails the rational basis test, which is sufficient to show a violation of the equal protection provisions of both Constitutions.

*Elk Horn Coal Corp.*, 163 S.W.3d at 418-419 (internal footnote citations omitted) (emphasis added). The *Elk Horn* court did not rule that the equal protection provisions of the Kentucky Constitution that are analogous to the federal equal protection provision, Sections 2 and 3, provide "heightened" equal protection. The Court made clear that it is the addition of Section 59 of the Kentucky Constitution, prohibiting local or special legislation, that provides the "heightened standard" in conjunction with Sections 2 and 3. *Id.*

This not a Section 59 case. Plaintiffs do not think this is a Section 59 case; after all, they did not plead a violation of Section 59 anywhere in their Amended Complaint as part of their state constitutional claims. Docket No. 37, ¶¶ 20, 27, 30, 35 (pleading only violation of Sections 1-3 of the Kentucky Constitution). While Plaintiffs would of course like to see this case reviewed under a standard "heightened" above the rational basis test, there is no legal basis for

doing so as a full review of *Elk Horn* makes clear: neither KRS 243.230(5) nor 804 KAR 4:270 is local or special legislation under Section 59.

      c.    *Plaintiffs Disregard The Fact That KRS 243.230(5) Applies To All Retailers.*

Plaintiffs' portrayal of KRS 243.230(5) is that it only applies to grocery stores, gas stations, and convenience stores. That is not true. By its title ("Premises for which retail package, drink, and malt beverage licenses may be issued") and terms, the statute applies to all premises seeking a retail package, drink, or malt beverage license. KRS 243.230. Moreover, the ten (10) percent sale of staple groceries restriction of 804 KAR 4:270, as applied to KRS 243.230(5), works two ways: it may prohibit grocery stores and gas stations from getting a package license for their "grocery premises," but it also keeps package stores from being in the "staple grocery business" or "gas and lubricating oil business" on their "liquor premises."

Grocery stores are grocery stores for a reason – they primarily sell groceries, all kinds of groceries. Dave Maxwell admitted that Plaintiff Maxwell's grocery sales were more than fifty (50) percent of the store's gross sales. Exhibit D, 11:22-12:13. Party Source, on the other hand, complies with the statute by selling significantly less than ten (10) percent staple groceries as part of its gross sales. Exhibit 4, ¶ 5. Regardless of whether Party Source could in fact sell more than 10% of its gourmet food, such sales of staple groceries would violate the limit established in KRS 243.230(5) and 804 KAR 4:270. *Id.*, ¶ 6. Such a violation risks the loss of Party Source's retail package liquor license, which would end its participation in the alcohol industry. *Id.*, ¶ 6.

At the end of the day, the issue is about a decision made as to what industry within which a retailer has chosen to work. Grocers are in the grocery business, liquor stores are in the liquor business. While the law permits some overlap (e.g. grocery stores can sell malt beverages; liquor stores can sell some staple groceries), it does not permit a "grocery store" to become a "package

22

liquor store" by selling wine and distilled spirits, and vice-versa. This is hardly a new and novel concept to grocers or package liquor stores since KRS 243.230(5) has been on the books for decades.

What Plaintiffs fail to admit, but FWWC's members already know, is that grocery stores (and gas stations and convenience stores) can get into the package liquor store business simply by having a separate, licensed premises for package sales. The front entrance to such package liquor and grocery premises can literally be within steps of one another (Trader Joe's on Shelbyville Road)[11] or it can be separated by other store fronts (Kroger in St. Matthews on Hubbards Lane). Plaintiffs fail to mention any of this in their Memorandum because they know it undercuts all of their arguments that grocers are strictly prohibited from selling wine and distilled spirits.

      d.     *KRS 241.060 Provides The Board With The Authority To Promulgate 804 KAR 4:270.*

Plaintiffs' incorrectly contend that the ABC Board had no authority to promulgate 804 KAR 4:270 in order to establish standards for enforcing KRS 243.230(5). KRS 241.060 sets forth the functions of the ABC Board to include:

> To promulgate reasonable administrative regulations governing procedures relative to the applications for and revocations of licenses, the supervision and control of the use, manufacture, sale, transportation, storage, advertising, and trafficking of alcoholic beverages, and all other matters over which the board has jurisdiction. Administrative regulations need not be uniform in their application but may vary in accordance with reasonable classifications.

KRS 241.060(1). It has long been recognized that "the Legislature has exercised its discretion as to what the [Kentucky Alcoholic Beverage Control Act] shall be, and has delegated to the Alcoholic Beverage Control Board the administration and enforcement of the law." *Ky.*

---

[11]     Anyone who has been to the Louisville Trader Joe's knows that you can see into the wine store from the grocery store because the "separating wall" between the grocery store and wine store is glass.

*Alcoholic Beverage Control Bd. v. Klein*, 301 Ky. 757, 762, 192 S.W.2d 735, 738 (Ky. 1946).

The core argument made by the Plaintiffs in this case concerning the invalidity of 804 KAR 4:270 as applied to KRS 243.230(5), that the General Assembly cannot delegate its power to the ABC Board to determine the standards of what constitutes "substantial part of the commercial transaction" and "staple groceries," has already been examined and rejected by other Kentucky courts.  "It is universally recognized that wide discretion must be granted to boards and commissions created for the purpose of regulating the liquor business. The nature of the business demands this."  *Klein*, 192 S.W.2d at 737.   In *Klein*, unsuccessful liquor license applicants brought suit against the ABC Board, claiming that the ABC Board's regulations concerning licensing were an improper delegation of legislative power to an administrative agency.  *Klein*, 192 S.W.2d at 736-737.   The *Klein* court put to rest any such notion as it discussed in detail in its opinion which is relevant to this case:

> The Legislature undoubtedly has the power to limit the number of places at which alcoholic beverages may be purchased by the drink or by the package. As said in *Schwierman v. Town of Highland Park*, 130 Ky. 537, 113 S.W. 507, 509, '**the retail liquor business has always been placed in a class by itself, and dealt with by special laws; so that the reasons that might deny the boards the right to discriminate between persons applying for licenses to engage in any other legitimate occupation and pursuit regulated and controlled by general laws have little or no application to this business. Although recognized legitimate and under the protection of the law, it stands apart from other lawful occupations, and must be treated in a class by itself**;' and in *Christian Moerlein Brewing Company v. Roser*, 169 Ky. 198, 183 S.W. 479, 481, 'it is well settled in this jurisdiction that the trustees or councils of municipalities, where the sale of intoxicating liquors is permitted by law, have a reasonable discretion in determining the places of sale, the number of licenses, and the persons to whom such licenses shall be granted; and when this has been done they may properly refuse to issue any additional licenses, even though there be no objection to the applicants or their proposed places of business.' But it is insisted by appellees that this power cannot be yielded to a Board, state or local, by the Legislature. **It is universally recognized that wide discretion must be granted to boards and commissions created for the purpose of regulating the liquor business. The nature of the business demands this**. In *Beacon Liquors v. Martin*, 279 Ky. 468, 131 S.W.2d 446, 448, this court said: 'Due to the inherent evils connected with the liquor business, for years it has been subjected to the strictest regulation in this

24

state, as well as all the other states of the Union, as to its manufacture, possession, transportation, sale and use. Regulations, which would be held to be arbitrary and unreasonable when applied to any other business, have been upheld by the courts in an attempt to exercise control over and restriction upon the liquor traffic.'

As pointed out in *Ziffrin, Inc., v. Reeves*, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128, the Kentucky Alcoholic Beverage Control Act is a comprehensive measure and provides for the rigid regulation of the liquor business. It sets forth in broad outlines the legislative policies for controlling the traffic, and necessarily delegates the details to administrative agencies. One of the most effective means to regulate the traffic and to carry out the legislative policies is to limit the number of retail outlets. The number of licenses that should be granted depends on many factors such as density of population, amount of police protection, and the character of territory where the licenses are sought, whether business or residential. These factors vary in different communities and are constantly changing. It would be impossible for the Legislature, which is in regular session only sixty days every two years, to deal in detail with the subject. In *Craig v. O'Rear*, 199 Ky. 553, 251 S.W. 828, 831, it was argued that a statute was void as a delegation of the functions of the Legislature, and the court said:

'It is next insisted that the act is void as a delegation of the functions of the Legislature. It must not be overlooked that Legislatures are not continuous bodies. As a rule, they are in session for only a few days each year, or every two years, as is the case in Kentucky. Of necessity such bodies cannot undertake to determine all facts incident to the administration of the laws which they enact. Therefore when we say that the Legislature may not delegate its powers, we mean that it may not delegate the exercise of its discretion as to what the law shall be, but not that it may not confer discretion in the administration of the law itself.'

Here, the Legislature has exercised its discretion as to what the law shall be, and has delegated to the Alcoholic Beverage Control Board the administration and enforcement of the law. The power to fix quotas, exercised with sound discretion, is part of the administration. Our conclusion that the power conferred by the Board in this respect is not an unlawful delegation of legislative functions is supported by the recent cases of *Ashland Transfer Company v. State Tax Commission*, 247 Ky. 144, 56 S.W.2d 691, 87 A.L.R. 534, and *Ratliff v. Hill*, 293 Ky. 36, 168 S.W.2d 336, 145 A.L.R. 754. In *Keller v. Kentucky Alcoholic Beverage Control Board*, 279 Ky. 272, 130 S.W.2d 821, 824, the constitutionality of the Alcoholic Beverage Control Act was attacked on the ground that it undertook to grant judicial powers to the Board. The following from the opinion in that case is pertinent here:

'Administrative boards and commissions have undoubtedly become an essential part of our governmental structure. That there are both advantages and disadvantages inherent in the system is admitted. That the legislative branches of government have granted to many of those bodies powers which in some respects combine judicial, executive and legislative action, notwithstanding the fundamental separation of the trinity, is not questioned. Our Constitution,

25

Sections 27 and 28, is clear and explicit on this delineation. It is likewise specific in declaring that the judicial power of the commonwealth shall be vested in the Senate and in the courts established by the constitution. Section 109. But agencies must of necessity be established by and through which the state must function in the exercise of the constitutional and police powers, and those agencies must of necessity be given discretion in performing their duties of administering the law and in the matter of promulgating detail rules and regulations. In the Alcoholic Beverage Control Act, the legislature has laid down much more than a skeletonized system and has not left to the Board, created by it, the power and privilege of filling in large gaps. The legislature itself has established the principles and policies and left only details of administration to be supplied by the Board. It has of necessity delegated by the execution of the law to the Board and its agents.'

*Klein*, 192 S.W.2d at 760-763 (emphasis added).

Do not be mistaken - the Plaintiffs' argument is not that the definitions applied to the prohibition against the sale of wine and distilled spirits in grocery stores are unconstitutional. Plaintiffs just do not like the definitions. Exhibit D, 72:9-15, 72:25-73:15. Be that as it may, the establishment of the definitions for "substantial part of the commercial transaction" and "staple groceries" was a valid use of the ABC Board's power to govern the procedures for governing licensing and enforcement of Kentucky's ABC laws. KRS 241.060. Moreover, the General Assembly specifically granted power to the ABC Board to establish reasonable classifications for such purposes: "[a]dministrative regulations need not be uniform in their application but may vary in accordance with reasonable classifications." KRS 241.060(1). Thus, establishing the ten (10) percent rule for the sale of staple groceries, gasoline, or lubricating oil, even if a non-uniform classification, is reasonable given the history of Kentucky's alcohol regulations and powers granted to the Board by the General Assembly.

Plaintiffs' reliance on *Bd. of Trustees of Judicial Form Ret. Sys. v. Atty. Gen. of Com.*, 132 S.W.3d 770 (Ky. 2003), does not save their arguments. First, the statute at issue (a bill that increased legislator retirement benefits) in that case had nothing to do with alcohol regulation and the State's powers under the Twenty-first Amendment. Second, the statute at issue in that

case was created by the General Assembly to be <u>intentionally incomprehensible</u>.  *Id.* at 780. Third, in order to be interpreted and implemented, it specifically referenced "any other applicable statute," but no other applicable statute existed.  *Id.* at 772-774.  Fourth, the Court determined that the General Assembly did not provide guidelines to the executive agency in charge of administering the statute.

None of these issues are involved in this case.  Twenty-first Amendment considerations cannot be ignored in the Court's ruling on Plaintiffs' Motion.  The special nature of alcohol and alcohol regulation that has existed since the end of Prohibition and the enactment of the Twenty-first Amendment make the circumstances of this case distinguishably different than *Bd. of Trustees of Judicial Form Ret. Sys.*  There is no evidence that KRS 243.230(5) was intentionally vague or incomprehensible in any way.  More importantly, it must be remembered that the General Assembly did not pass KRS 243.230(5) without guidance to the ABC Board. Rather, KRS 241.060 sets forth the powers of the ABC Board to promulgate regulations and standards for alcohol regulation in the Commonwealth.

The development and promulgation of 804 KAR 4:270 was a valid exercise of authority by the ABC Board.  Enforcing KRS 243.230(5) according to the standards set forth 804 KAR 4:270 is a valid exercise of authority by the ABC Board.  Plaintiffs have no valid basis to claim otherwise.

       e.    *Plaintiffs' Sought After Relief Is The Separation Of Powers Violation, Not KRS 243.230(5) And 804 KAR 4:270.*

Plaintiffs ask this Court to violate the separation of powers doctrine by rewriting Kentucky's alcohol regulation over the sales of wine and distilled spirits in the Commonwealth by removing the prohibition against grocery stores, gas stations, and convenience stores from doing so.  Party Source has already detailed why the Court should not engage in such a violation

27

and incorporate that discussion by reference herein. Party Source's Memorandum, pp. 12-18. Nevertheless, a further brief response to Plaintiffs' separation of powers argument is warranted.

Plaintiffs' acknowledge, just as Party Source did, that the separation of powers doctrine has been given greater emphasis in Kentucky than in other States. But that cuts more than one way, which Plaintiffs ignore. The Plaintiffs' point is that the legislature cannot delegate away its lawmaking responsibilities to an executive agency. If one accepts that is true, as Party Source concedes, then one must also accept that the judiciary cannot usurp the lawmaking responsibilities of the legislature or the administration and enforcement responsibilities of the executive.

The touchstone of Kentucky's nondelegation standard is that Kentucky law mandates that "the legislature must lay down policies and establish standards." ***Bd. of Trs. of Judicial Form Ret. Sys. v. Attorney Gen. of Com.***, 132 S.W.3d 770, 782 (Ky. 2003), citing ***Bloemer v. Turner***, 281 Ky. 832, 137 S.W.2d 387, 391 (1939). Chapters 241, 242, 243, and 244 are policies and standards for the regulation of alcohol in Kentucky. The General Assembly made sure that the ABC Board created in Chapter 241 was provided direction and standards from which to operate in the form of KRS 241.060. It is from this statute that the ABC derives its delegated authority from the General Assembly. Moreover, the General Assembly even allowed for non-uniform regulations based on reasonable classifications. KRS 241.060(1). For this Court to rule otherwise would be the true separation of powers violation.

f.   *Plaintiffs Have No Valid Due Process Claim.*

Plaintiffs' due process allegations are as unavailing as the rest of their unfounded claims. Plaintiff's cited authority does not support their due process allegations. Plaintiffs cite ***Connally v. Gen. Const. Co.***, 269 U.S. 385 (1925), and ***Sullivan v. Brawner***, 237 Ky. 730, 36 S.W.2d 364 (1931), as their basis for the proposition that vague statutes can violate due process. The

Plaintiffs fail to acknowledge that both cases involved <u>criminal statutes</u> in which the crime and penalties were not "so clearly expressed that the ordinary person can intelligently choose, in advance, what course is lawful for him to pursue." ***Sullivan***, 36 S.W.2d at 368. Plaintiffs also ignore that in vagueness cases, "'the degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment.' A more stringent test applies if the provision interferes with constitutional rights, and a less stringent test applies if the provision concerns civil rather than criminal penalties." ***Assoc. of Cleveland Fire Fighters v. City of Cleveland***, 502 F.3d 545, 551 (6th Cir. 2007) (internal citation omitted). Even ***Connally*** and ***Sullivan*** recognized that "where the entire context eliminates vagueness and uncertainty, the statute is valid." ***Sullivan***, 36 S.W.2d at 368. And, of course, there is no constitutional right to a package liquor permit. U.S. CONST. amend XXI.

The best example of the Plaintiffs' overreaching in their vagueness argument is their feigned ignorance of the term "staple groceries." The Plaintiffs have long been in the grocery business in Kentucky. Yet they claim to have no understanding of what staple groceries consist of and argue that the General Assembly "pulled the term out of the air." Plaintiffs' Memorandum, pp. 39. Plaintiffs cannot claim ignorance of the definition of staple groceries in 804 KAR 4:270 when it is substantially similar to the definition in KRS 243.280(a) that they do understand. Plaintiffs' Memorandum, p. 7. Compare the definition of "food and groceries" in KRS 243.280(a) to that of "staple groceries" applied to KRS 243.230(5):

> The term "food and groceries" means:
>
> (a) Any food or food product intended for human consumption except alcoholic beverages, tobacco, hot foods, and hot food products prepared for immediate consumption;
>
> KRS 243.280(a)
>
> \*\*\*\*\*\*\*\*\*\*

staple groceries shall be defined as any food or food product intended for human consumption except alcoholic beverages, tobacco, soft drinks, candy, hot foods and food products prepared for immediate consumption.

804 KAR 4:270 (applied to KRS 243.230(5)).

With the exception of the terms "soft drinks" and "candy" in 804 KAR 4:270, the definitions are identical.  Are Plaintiffs then claiming in this case that the addition of "soft drinks" and "candy" to the exceptions listed in 804 KAR 4:270 makes the definition vague? Was it the addition of the word "staple" before "groceries" over twenty-five (25) years ago when 804 KAR 4:270 became effective that so confounds grocers and grocery corporations who have been in the grocery business in Kentucky for decades?  Plaintiffs rely on KRS 243.280(a) in support of their argument that the sale of alcohol and groceries together has already been approved by the General Assembly.  Plaintiffs' Memorandum, pp. 7-8.  By doing so, Plaintiffs can hardly claim that they do not understand KRS 243.280(a) and by extension KRS 243.230(5).

Interestingly, even the proposed definition of a "retail food establishment" (i.e. a grocery store) contained in the proposed legislation (HB 585) FWWC lobbied for to establish a wine license for grocery stores is consistent with the definitions above.  The proposed definition of a retail food establishment eligible for a wine license combined a square footage requirement for the premises plus the maintenance of "a minimum inventory of twenty thousand dollars ($20,000) in fresh meat, fresh produce, frozen food, dairy products, or a combination of those items."  Exhibit 3, attached Exhibit A, p.1.  This is entirely consistent with 804 KAR 4:270: meat, produce, frozen food, and dairy are certainly food or food products intended for human consumption, and they are not alcoholic beverages, tobacco, candy, hot foods, or food "prepared" for immediate consumption.  Moreover, the proposed legislation was not looking to replace KRS 243.230(5), it was looking to create an exception to the statute as evident from the language at the very beginning of the proposed bill – "[n]otwithstanding KRS 243.230(5) . . . ."

30

*Id.*

Even more harmful to Plaintiffs' claim of vagueness and misunderstanding is the fact that at no time have Plaintiffs applied for package licenses for their grocery stores.  If Plaintiffs were truly confused as to the eligibility of grocery stores for package liquor licenses under KRS 243.230(5) because of the "vague" definitions, one would expect that at least one Kentucky grocery store would have applied for a package license for its grocery store premises under the confused notion that it would be eligible for a license.  But there is no record evidence of even a single "confused" grocery store applying for a package license due to a misunderstanding of its eligibility under KRS 243.230(5).

The inescapable conclusion is that Plaintiffs are not confused as to the terms "substantial part of the commercial transaction" and "staple groceries."  They were not confused before 804 KAR 4:270 went into effect, and they have not been confused since.  That is the whole point of Kroger and Trader Joe's having separate premises to sell wine and distilled spirits – they understand the KRS 243.230(5) prohibition.  Plaintiffs just do not want the statute or regulation to apply to them anymore.  That was the whole point of FWWC's legislative efforts and, subsequently, this lawsuit – eliminate the prohibition against wine in grocery stores.  There is no basis for a due process claim.

## III.    CONCLUSION

Despite all of their arguments, Plaintiffs have failed to establish that they are entitled to summary judgment on any of their claims.  Plaintiffs have made unsubstantiated assumptions of fact and logic.  Plaintiffs rely on "facts" that are not supported in the record.  Plaintiffs do not have support in the law for their claims.  For all of these reasons, as described in detail throughout this Response, Plaintiffs have no valid claims.  Accordingly, this Court should deny Plaintiffs' Motion.

Respectfully Submitted,

*/s/ Kevin L. Chlarson*
Kenneth S. Handmaker
Kevin L. Chlarson
MIDDLETON REUTLINGER
2500 Brown & Williamson Tower
Louisville, Kentucky 40202
(502) 584-1135
(502) 561-0442 (fax)
khandmaker@middreut.com
kchlarson@middreut.com
*Counsel for Intervening Defendant*

## CERTIFICATE OF SERVICE

It is hereby certified that on this 30th day of January, 2012, Intervening Defendant's Response Brief In Opposition to Plaintiffs' Motion for Summary Judgment was electronically filed with the clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

M. Stephen Pitt, Esq.
Merrill S. Schell, Esq.
Christopher W. Brooker, Esq.
Wyatt, Tarrant & Combs
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202
Counsel for Plaintiffs


Peter F. Ervin, Esq.
General Counsel, Public Protection Cabinet
Capital Plaza Tower
500 Metro Street, Fifth Floor
Frankfort, Kentucky 40601
Counsel for Defendants

*/s/ Kevin L. Chlarson*
Counsel for Intervening Defendant