UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | | |
|---|---|---|
| MAXWELL'S PIC-PAC, INC., et al. | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:11-CV-18-H |
| | ) | |
| TONY DEHNER, et al. | ) | |
| | ) | |
| DEFENDANTS | ) | |

**PLAINTIFFS' RESPONSE TO
PARTY SOURCE'S MOTION FOR SUMMARY JUDGMENT**

The Intervening Defendant Liquor Outlet, LLC ("Party Source") is the state's largest liquor store. It intervened in this case for one simple, obvious reason: To limit competition. Namely, it and other current wine and liquor licensees do not want to compete with grocery stores in the Kentucky wine and liquor market.[1] Party Source and its brethren already face stiff competition from each other, as well as from national retailers such as Walgreens, CVS, and Rite-Aid, and they do not relish the prospect of additional competition.

The fact is, however, that both the Federal and Kentucky Constitutions require retailers to succeed based upon their business acumen and resourcefulness – not because state law arbitrarily excludes a set of similarly situated retailers from a marketplace. But that is exactly what is happening here – KRS 243.230(5) and 804 KAR 4:270 arbitrarily exclude grocery stores from Kentucky's wine and liquor market to the benefit of Party Source and the like.

---

[1] This is borne out by the affidavits supporting Party Source's motion, which were provided by Roger Leasor, the President of Liquor Barn, which has 10 Kentucky locations, and Karen Lentz, a lobbyist for the Kentucky Liquor Retailer Coalition [Dkt. 40-5 and 40-20].

Desperate to protect this arbitrary discrimination, Party Source filed a motion for summary judgment in which it does virtually everything but cite to a rational basis for the discriminatory classification at issue. In fact, much of Party Source's argument is based on the false premise that Kentucky law limits wine and liquor sales to "package stores" such as Party Source, whose primary business is selling alcohol. Party Source's motion for summary judgment completely ignores the fact that Kentucky law allows retailers such as Walgreens, CVS, and Rite-Aid, which are obviously not "package stores," to also sell wine and liquor. Party Source misleads in this manner because it knows that it cannot offer any rational basis for allowing a Walgreens to sell wine and liquor but not a grocery store.

The bottom line is that there is no justification for banning grocery stores and convenience stores from applying for a license to sell wine and liquor while allowing any other retailer to apply. This discrimination is identical in logic and effect to a law prohibiting wine and liquor sales by businesses whose name starts with the letter "P," or by businesses owned by a person who wears an earring, or by businesses located on the south side of a street. Accordingly, the laws banning Plaintiffs from selling wine and liquor should be declared unconstitutional and Party Source's motion for summary judgment denied.

1.     **The Statute of Limitations Does Not Bar the Coalition's Claims.**

Party Source leads off its summary judgment motion by arguing that the Coalition's claims, which are purely declaratory in nature and do nothing more than challenge the constitutionality of KRS 243.230(5) and 804 KAR 4:270, are time-barred [Dkt. 40-1 p. 7]. Party Source alleges that "the applicable statute of limitations is the limitations period for personal injury claims under state law," and that period is one year [*id.*]. Party Source contends that since the Coalition did not bring its action within one year of its formation, it is forever barred from

challenging the constitutionality of the laws at issue, and must forever abide by them, even if they are unconstitutional [*id.*].

This argument is groundless.  It is a basic maxim of both Kentucky and Federal law that an unconstitutional law is void *ab initio*, meaning a citizen impacted by a law's continued enforcement can challenge its constitutionality at **any time**.   Contrary to Party Source's contention, an unconstitutional law cannot be bestowed with constitutionality, or immunized from challenge, by a statute of limitation:

> A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within [the statute of limitations period] after its enactment.   The continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations.

*Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997).  Party Source's suggestion to the contrary borders on the spurious.  According to Party Source's logic, the claims of the plaintiffs in *Brown v. Bd. of Education*, 347 U.S. 483 (1954), would have been time-barred, and the separate-but-equal laws should have survived, simply because those discriminatory laws had been on the books for a long time, and the injury that they caused was "known" to the *Brown* plaintiffs far longer than any one-year or two-year personal injury statute of limitations.  This contention fails on its face.  Furthermore, all of the cases that Party Source cites in support of its statute of limitations argument are inapposite, as they are cases where the plaintiff sought an actual recovery from the government for a specific unconstitutional act.  Those cases are unlike this one, where Plaintiffs simply seek to have continually enforced laws declared unconstitutional.

Nonetheless, even if Plaintiffs' statute of limitations argument were correct (and it is not), the limitation would only apply to the Coalition, **not** to Plaintiff Maxwell's Pic-Pac.  Maxwell's Pic-Pac was incorporated on March 25, 2010, and it filed this lawsuit on January 10, 2011 – well

within a year of its incorporation. Accordingly, even under Party Source's groundless theory, Maxwell's Pic-Pac filed its claim within one year of its birth. Party Source's memorandum even implicitly concedes this, as Party Source does not contend that Maxwell's Pic-Pac's claims are time-barred. Therefore, no matter how it is cut, the substantive issues in this case should be decided.

### 2.    The Coalition Has Associational Standing to Maintain This Action.

Party Source's next argument is that the Coalition "does not have standing." Specifically, Party Source contends that the Coalition lacks standing because (a) its members are not in the gasoline or lubricating oil business, (b) its member grocery stores have not suffered an injury in fact because they can seek licenses to open separate wine and liquor stores near their grocery premises, (c) there are only a limited number of licenses and thus there is no "guarantee" that any of the Coalitions members "would apply for and receive a license," and (d) "the selling of distilled spirits is not germane to [the Coalition's] purpose." [Dkt. 40-1 pp. 9-11]. These four arguments are inaccurate and frivolous.

### a.    Coalition Members Are In the Gasoline and Lubricating Oil Business.

In its memorandum, Party Source explicitly admits that "some of FWWC's members' individual stores sell gas (e.g., Kroger's)" [*id.* at 9]. Paradoxically, Party Source urges the Court to ignore this admission (and reality) and hold as a matter of law that Coalition members do ***not*** sell gas, contending that "there is no record evidence that FWWC's members are anything but grocers" [*id.*].[2] And based on this purported alleged lack of "record evidence," Party Source asks

---

[2] For associational standing to exist, of course, only one member of the plaintiff association need have standing. *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *American Federation of Gov't Employees v. Clinton*, 180 F.3d 727, 733 (6th Cir. 1999). This issue was dealt with in the Court's Order of November 7, 2011 [Dkt. 31 pp. 10-12].

this Court to find as a matter of law that the Coalition cannot challenge the statutory ban on wine and liquor sales by those who sell gasoline and lubricating oil.

This argument is stunningly misleading, as there *is* record evidence that Coalition members sell gas and lubricating oil. Namely, Party Source propounded an interrogatory upon the Coalition asking it to identify which of its members "owns or operates any business in Kentucky in which a substantial part of the commercial transaction consists of the selling at retail gasoline and lubricating oil" [Ex. U hereto]. The Coalition provided verified answers showing that three of its members sell gasoline and lubricating oil [*id.* at p. 2]. The Coalition even provided a detailed list of its members' gas station locations [*id.* at pp. 2-3]. Accordingly, Party Source's declaration that "there is no record evidence that FWWC's members are anything but grocers" is false. The fact that Party Source would ask this Court to ignore reality (and the record) and hold as a matter of law that Coalition members do not sell gasoline, and therefore lack standing to proceed with their claims in this case, is telling.

In any event, Party Source cannot deny that Maxwell's Pic-Pac and the other Coalition members all sell groceries. Since KRS 243.230(5) applies squarely to sellers of groceries and gasoline, sellers of either product are precluded from seeking a wine and liquor license and thus would have a legitimate interest in challenging the statute's constitutionality.

   b. Coalition Members Are Injured By The Arbitrary Discrimination At Issue.

Party Source also suggests that Coalition members have not suffered an "injury in fact" and therefore lack standing. Specifically, Party Source contends that because Coalition members are free to open, and in some cases have opened, wine and liquor stores in premises physically separate and apart from their grocery store(s) that they are not hurt by the laws at issue [Dkt. 40-1 pp. 9-10]. Party Source is wrong again. It is undisputed that because of the laws at issue, in

5

order for Coalition members to sell groceries **and** wine they must first incur the tremendous capital cost of building or renting a new store with a separate cash register (or registers). They are also required to incur the substantial on-going operational cost of employing additional staffers to run the separate check-out. Other retailers who sell "staple groceries," but just in smaller proportions than Coalition members, do not have to build or rent a separate store, or hire additional employees, in order to sell both "staple groceries" and wine. Accordingly, Party Source, Walgreens, CVS, and Rite-Aid all sell "staple groceries" and wine in the same premises in the same transaction [Dkt. 40-6 ¶¶ 4-5, Dkt. 41-1 through 41-21]. Yet they are not forced to incur the significant additional cost that Coalition members must incur simply to sell wine and liquor. This is undeniably an injury in fact.

Moreover, all Coalition members are injured whenever a shopper wants to purchase a grocery item, such as a package of cheese, along with a bottle of wine. That shopper will be inclined to purchase both their cheese and wine from a retailer that carries both, such as Walgreens, Rite-Aid, or Party Source, instead of making a trip to a grocery store for the cheese and another trip to another retailer for the wine. Wine and liquor sellers such as Rite-Aid know this, and gear their advertising to attract such customers away from grocery stores, even going so far as advertising that they accept SNAP/EBT card benefits ("food stamps") on the same page where they advertise their wine and liquor [Dkt. 41-4].

But what is more, even if a grocery store builds or rents a separate wine and liquor store close to its grocery store, that retailer is **still** at a competitive disadvantage because a consumer purchasing cheese and wine from a grocer such as a Kroger will **still** have to engage in two transactions at two stores. A consumer purchasing milk and wine from a retailer such as Rite-

Aid, however, will only have to engage in one transaction at one store.  Consumers will be inclined to take the more convenient option.

These obvious and undeniable injuries to Coalition members are exactly why Party Source intervened in this case – Party Source and its industry comrades benefit from those injuries and wants to perpetuate them.  Party Source now asks this Court to enter a summary judgment perpetuating the laws that force consumers to buy their wine and liquor somewhere other than at Coalition stores.  Put simply, Party Source will gladly sell any consumer a package of cheese and a bottle of wine in the same transaction, at the same store, any day of the week,[3] and it wants as little competition for those dollars as possible.  Party Source's suggestion that Coalition members are not injured by the laws at issue is as groundless as its suggestion that Coalition members do not sell gasoline.

    c.    The Fact that There Are A Limited Number of Licenses Does Not
          Deprive Plaintiffs of Standing.

Party Source next contends that the Coalition has no standing because the striking down of KRS 243.230(5) and 804 KAR 4:270 "will not guarantee package liquor licenses to FWWC's members," as Kentucky has a "quota system" under which there are only a limited number of wine and liquor licenses available in each jurisdiction [Dkt. 40-1 p. 10].

Kentucky indeed has a "quota system," and if the arbitrary discrimination now at issue is struck down, there is no guarantee that each and every license application ever submitted by a Coalition member – or any applicant – in the future will be granted.  Some applications,

---

[3] Party Source, which professes in this case to be a proponent of limiting the hours in which alcohol is available for purchase, actually sued the Kentucky ABC Board to force the State to expand sales of wine and liquor to Sundays.  *Liquor Outlet, LLC v. Alcohol Beverage Control Board*, 141 S.W.3d 378 (Ky. App. 2004).  Its lawsuit succeeded.  If Party Source were truly interested in the goal of reducing the availability of alcohol it would never have filed a lawsuit seeking to expand the days on which wine and liquor can be sold.

however, will inevitably be granted – otherwise Party Source would not have intervened in this suit.  And the fact that a Coalition member's application might be rejected for some reason other than it being a grocery store does not mean that the Coalition lacks standing to challenge a law that bans its members from even applying and being considered for a license in the first place.  If Party Source were right, the legislature could ban persons with pierced ears, or dark skin, from applying for admission to the University of Kentucky, and those banned from applying would have no standing to challenge the law because there is no guarantee that they would otherwise have been accepted to the University, as they may not have the necessary grades or ACT scores, or the freshman class may simply be full.  Under Party Source's logic, the plaintiff in the landmark case *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337 (1938), who was denied admission to the University of Missouri law school because he was African-American, would not have had standing to challenge his exclusion because there was a possibility that he would not have been accepted to the law school even if he were white.  This argument is groundless on its face.  While the Equal Protection Clause does not guarantee admission to a school, or the granting of one of a limited number of licenses, it most certainly guarantees similarly situated individuals the right to ***at least apply*** for a limited benefit the state is providing.  And here, it guarantees Coalition members the right to at least apply for a wine and liquor license, as there is no rational basis, much less the required "substantial and reasonable justification" under Kentucky law, for prohibiting a retailer from obtaining a wine and liquor license simply because a "substantial part of its commercial transaction" comes from "staple groceries" or gasoline.

        d.      The Fact that Coalition Members Are More Interested In Selling <u>Wine than Liquor Does Not Deprive the Coalition of Standing.</u>

Party Source next argues that the Coalition lacks standing because its primary purpose is to end the discrimination at issue so that its members can sell ***wine*** in their stores.  Party Source

suggests that because the Coalition's Articles of Incorporation and "promotional materials" do not reference distilled spirits that it cannot pursue this lawsuit [Dkt. 40-1 p. 11].

Party Source's desperation knows no bounds.  Indeed, the Food With *Wine* Coalition opposes Kentucky laws that prohibit the sale of *wine* in grocery stores.  In Kentucky, however, wine and distilled spirits are sold under one license – a "retail package license."  There is no separate "wine" license and "liquor" license.  Accordingly, in order to sell wine, Coalition members must obtain a "retail package license" that allows them to sell both wine *and* liquor.  The fact the state has chosen to bundle wine and liquor under one license does not defeat the Coalition's standing to pursue this case.  There is, after all, no requirement that a retail package licensee actually sell liquor.  As Dave Maxwell confirms, if Maxwell's Pic-Pac is granted a retail package license, it plans on only selling wine [Dkt. 41-30 p. 60].  But in order to do so it must obtain a "retail package license" allowing it to sell both.  Just because Maxwell's Pic-Pac, and other Coalition members, may not plan on selling liquor in their stores does not mean that they lack standing to challenge a law prohibiting them from obtaining a "retail package license."

### 3.    Maxwell's Pic-Pac Has Individual Standing To Bring This Suit.

Party Source next argues that Maxwell's Pic-Pac has no individual standing because it was formed in March, 2010 – years after the arbitrary discrimination in KRS 243.230(5) and 804 KAR 4:270 was put in place [Dkt. 40-1 pp. 11-12].  Party Source contends that Maxwell's founders knew that their new business would not be allowed to sell wine and liquor when they created Maxwell's Pic-Pac, so Maxwell's Pic-Pac has not been "injured in fact" [*id.*].

Party Source's "expectation at creation" argument is ridiculous.  According to Party Source's logic, the Plaintiffs in *Brown v. Bd. of Education*, who were African-American children denied the right to attend the same schools as white children, would lack standing to challenge the "separate-but-equal" laws because their parents knew about the "separate-but-equal"

discrimination at the time they created their children – the plaintiffs – and those parents could have had no expectation that their children would be treated equally as all similarly situated children because the discriminatory laws at issue had existed for a long time.  This suggestion fails on its face.  A person or business cannot be arbitrarily discriminated against because of the timing of their creation or the beliefs of their creators.  The subjective beliefs of a person's parents, or a corporation's creators, have no bearing on that person's or corporation's standing to challenge arbitrary discrimination.  Courts instead look to whether the actual plaintiff is injured by the discrimination, and here, Maxwell's Pic-Pac was, and continues to be, injured by KRS 243.230(5) and 804 KAR 4:270.[4]  Accordingly, Maxwell's Pic-Pac has standing to maintain this lawsuit.[5]

### 4.   <u>Plaintiffs' Lawsuit Does Not Violate the Separation of Powers.</u>

Party Source next argues, in short, that this Court does not have the power to strike down a law as unconstitutional.  It contends that any law passed by the Kentucky legislature is beyond the purview of judicial review, and the act of a Court striking down a law is an unconstitutional judicial invasion into the province of the legislature:

> Plaintiffs ask this Court to eliminate KRS 243.230(5) and 804 KAR 4:270.  Under the U.S. Constitution and the Kentucky Constitution, Section 28, the Court is prohibited from engaging in such judicial activism.

[Dkt. 40-1 p. 13].

---

[4] If the subjective expectations of a corporation's incorporators were relevant (and they are not), Maxwell's incorporators may have reasonably expected that KRS 243.230(5) and 804 KAR 4:270 would eventually be changed by the legislature or declared unconstitutional by a court.

[5] Maxwell's Pic-Pac was under no duty to actually apply for a license and have its application rejected, or otherwise exhaust administrative remedies in connection with such a guaranteed rejection, before filing this § 1983 action.  *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982).

Party Source contends that Kentucky's legislature "does not want wine or distilled spirits sold in grocery stores," and since the Coalition has "twice tried and failed to persuade the General Assembly to enact a 'wine license' to allow the sale of wine in grocery stores," that this Court is somehow barred from reviewing the constitutionality of KRS 243.230(5) and 804 KAR 4:270 [*id.* at 14].[6]

If that were true, it would turn over 200 years of jurisprudence, beginning with *Marbury v. Madison*, 5 U.S. 137 (1803), on its head. But it is not true, as "judicial review" is one of the core duties of a court, and engaging in judicial review does not constitute "judicial activism" or an intrusion into the legislature's powers. To the contrary, judicial review is the primary check on the legislature's power, and is perhaps the Constitution's greatest protection. Contrary to Party Source's belief, both the Federal and Kentucky Constitutions are higher authorities than the "wants" of the Kentucky Legislature. The fact that a legislature "does not want" something, whether it be the sale of wine in grocery stores or integrated schools, does not mean that laws prohibiting what the legislature "does not want" are constitutional.

Moreover, the fact that the Coalition's prior legislative efforts were unsuccessful does not mean that KRS 243.230(5) is therefore constitutional, and/or is somehow immune from judicial review. As this Court held in its November 2, 2011 Order regarding a discovery dispute in this case, "[l]egislative engagement and judicial action are not 'either/or' propositions. The Coalition may properly seek to affect change by either route without imperiling its ability to seek relief by

---

[6]   Party Source attaches an affidavit of Karen Lentz, one of the Kentucky Retail Liquor Coalition's lobbyists, showing that Ms. Lentz and her colleagues worked hard to defeat the Food With Wine Coalition's legislative effort and thereby preserve the *status quo* [Dkt. 40-5].

the other one." [Dkt. 31 p. 13].[7]   Accordingly, Party Source's contention that this Court cannot engage in judicial review of KRS 243.230(5) and 804 KAR 4:270 without invading on the legislature's province fails on its face.

### 5.   The 21st Amendment Does Not Supersede Other Provisions of the United States Constitution.

Party Source next contends that "Plaintiff's Equal Protection and Due Process Claims do not trump the power of the legislature to regulate the sale and trafficking of alcoholic beverages under the Twenty-First Amendment" [Dkt. 40-1 p. 18].  In other words, Party Source argues that the 21st Amendment trumps the Equal Protection and Due Process protections of the United States and Kentucky Constitutions.  While Party Source summarily states that "in light of the *Granholm* ruling, it is not hiding behind the Twenty-First Amendment," that is exactly what Party Source is trying to do in section "F" of its motion for summary judgment.

The 21st Amendment provides the states with broad powers when it comes to the manufacture, sale, and transportation of alcohol.  That said, the United States Supreme Court recently, and unequivocally, stated that "the Twenty-First Amendment does not supersede other provisions of the Constitution."  *Granholm v. Heald*, 544 U.S. 460, 486 (2005).  "[S]tate laws that violate other provisions of the Constitution are not saved by the Twenty-First Amendment. The [United States Supreme] Court has applied this rule in the context of the First Amendment,

---

[7] When arguing that judicial review violates the separation of powers, Party Source claims that "Plaintiffs argue that Kentucky grocery stores should be allowed to sell wine because grocers are allowed to do so in 34 other states, including six of Kentucky's seven border states" [Dkt. 40-1 p. 17].  While the Coalition argued those facts (which are true) to the legislature, it does not argue them to this Court because they do not matter here.  There are big differences between what is relevant and appropriate in the political and legislative arena compared with the judicial system. In this case, Plaintiffs challenge the constitutionality of the laws at issue because they arbitrarily discriminate and are impermissibly vague.  Having no legitimate response to these constitutional arguments, Party Source resorts to trying to defeat policy arguments that the Coalition made *only* to the legislature and not to this Court.

the Establishment Clause, the Equal Protection Clause, the Due Process Clause, and the Import-Export Clause."  *Id.* at 486-487 (citations omitted).

Kentucky's Supreme Court has also applied this rule, as demonstrated by *Kentucky ABC Board v. Burke*, 481 S.W.2d 52 (Ky. 1972), where it struck down laws prohibiting women from working as bartenders, and drinking liquor at bars, as violating the equal protection provisions of the Federal and Kentucky Constitutions.  *Id.* at 54.  Accordingly, Party Source's suggestion that the 21st Amendment allows the state to arbitrarily discriminate against Plaintiffs is a non-starter. In order for KRS 243.230(5) and 804 KAR 4:270 to be ruled constitutional, the state must cite to a substantial and reasonable justification for the classification now at issue.  Party Source fails miserably in its effort to do so.

### 6. Party Source Fails to Cite Any Rational Basis, Much Less a Substantial and Reasonable Justification, Supporting The Discrimination At Issue.

Party Source states that there is "no equal protection claim" in this case.  It contends that what this case boils down to is a matter of choice.  Specifically, Party Source argues that KRS 243.230(5) and 804 KAR 4:270 apply "equally to all retailers," and thus all retailers are presented with the following choice:  They can choose to keep their sales of staple groceries and gasoline to under ten percent of their business, and thereby choose to be able to sell wine and liquor, or they can choose to make "staple groceries" and gasoline more than ten percent of their business, and thereby choose to be prohibited from selling wine and liquor:

> If Party Source wants to sell staple groceries in excess of the 10% ceiling, it must decide whether it wants its premises devoted to the grocery business or to the package liquor business.  If a hardware store wants to sell staple groceries in excess of the 10% ceiling, then it has eliminated itself as a potential package liquor store applicant.  Plaintiffs get no free ride in this regard.  Since the law applies equally to all retailers, there can be no equal protection violation.

[Dkt. 40-1 p. 23].

In other words, Party Source believes that so long as a person or entity can "decide" which arbitrary class that they are a part of, then the state is free to create two arbitrary classes and discriminate against one of them.  According to Party Source's logic, the University of Louisville can prohibit persons who wear earrings, or green shirts, from applying for admission to the school.  While such discrimination has no rational basis, every potential applicant can simply choose not to wear an earring, or a green shirt, and by making that choice, can qualify to submit an application to the University.  Or, according to Party Source, the legislature can ban the sale of wine and liquor by any retailer located on the south side of a street that runs from east to west.  While such discrimination has no rational basis, Party Source suggests that such arbitrary discrimination is perfectly fine because retailers can choose which side of the street they locate their businesses on, and by choosing to locate on the south side of a street, a retailer has chosen to be denied the right to sell wine and liquor.

Party Source's "choice" argument is groundless on its face.  The question of whether a law violates equal protection does not turn on whether a person "chooses" to be part of an arbitrary class, or can "decide" to remove himself from that class.  Instead, the analysis turns on whether there is a rational basis for discriminating between similarly situated individuals, even if the distinguishing difference is the result of a person's choice.  Is there any rational basis for a law denying drivers' licenses to those who wear earrings?  Such a law, after all, would serve the "legitimate state purpose" of reducing road congestion, reducing pollution, and preventing accidents because it would result in fewer drivers.  But if there is no substantial or reasonable justification for a classification that discriminates against earring wearers when it comes to issuing drivers' licenses, the discrimination is unconstitutional, even though a person could "choose" not to wear earrings and therefore obtain a drivers' license.

Party Source proffers this "choice" argument because it cannot proffer any rational basis (the federal standard), much less a substantial or reasonable justification (the Kentucky standard), for the laws that effectively prohibit grocery stores and convenience stores from selling wine and liquor but allow all other retailers – from drug stores to hardware stores to gun stores – to sell wine and liquor.  Accordingly, Party Source tries to shift the inquiry.  But its efforts to do so should be rejected, because the discrimination at issue in this case is as arbitrary and invidious as a law prohibiting those from wearing earrings from obtaining a drivers' license.  The fact that the discrimination may serve a valid state purpose, and be the result of a retailer's "choice," does not render it constitutional.[8]

### 7.   Plaintiffs Have Stated a Viable Due Process Claim.

Party Source next challenges Plaintiffs' "void for vagueness" claim.  Party Source suggests that KRS 243.230(5) is not vague because the terms "substantial part," "of the commercial transaction," and "staple groceries" are capable of being defined.  Party Source demonstrates that the terms are capable of being defined by pointing to the ABC Board unilateral definition of the terms, and the fact that the Coalition suggested a concrete definition for the term "staple groceries" to the legislature during the Coalition's legislative efforts:

---

[8] Nebraska's Supreme Court has invalidated laws similar to KRS 243.230(5) and 804 KAR 4:270 on equal protection grounds.  *See, e.g., Gas 'N Shop, Inc. v. Nebraska Liquor Control Comm.*, 427 N.W.2d 784, 789 (Neb. 1988) (ordinance prohibiting any business other than a restaurant, bowling alley, hotel, motel, or club to sell liquor with other items was a violation of equal protection, as there was no rational basis for the distinction); *Gas 'N Shop, Inc. v. Nebraska Liquor Control Comm.*, 492 N.W.2d 7, 12 (Neb. 1992) ("convenience stores may not be treated differently from other operations which combine the sale of liquor with the sale of other merchandise or services, for the differing treatment bears no reasonable relationship to the State's policy of furthering temperance").

> How grocers cannot define staple groceries is a mystery – consider the definition under 804 KAR 4:270 and consider the definition that they sought to have adopted in connection with their ill-fated HB 585 to have a retail food establishment wine license in 2008.

[Dkt. 40-1 p. 26].

Party Source misses the point. The issue here is not whether the vague statutory terms can be defined. They can be. The issue is who defines them. And both the Federal and Kentucky Constitutions clearly hold that it is not up to the ABC Board, or the "grocers," to define statutory terms such as "staple groceries." Rather, it is up to the **legislature** to provide clear definitions of those terms, or to at least provide regulators with guidelines, standards, or a framework for defining or enforcing these terms. In this case the legislature provided **neither**, and thereby confused both the ABC Board and the public. Accordingly, the ABC Board promulgated 804 KAR 4:270 to bring an end to the **admitted** "confusion:"

> **The statute [KRS 243.230(5)] does not define "substantial part of the commercial transaction" or "staple groceries." This administrative regulation is adopted to eliminate the confusion that an absence of such definitions has caused.**

804 KAR 4:270 (emphasis added).

The legislature, however, is not constitutionally allowed to "confuse." As the United States Supreme Court aptly stated in *Connally v. General Const. Co.*, 269 U.S. 385 (1925), if reasonable men can differ as to the meaning of a law, it violates due process:

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as its meaning and differ as to its application violates the first essential of due process of law.

*Id.* at 391. Here, Party Source's own brief (unwittingly) confirms that people of common intelligence differ as to the application of the term "staple groceries," as the definition that the Coalition allegedly advocated to the legislature is remarkably different from the definition written by the ABC Board [Dkt. 40-1 p. 26]. Whether the legislature intended either of those

definitions, or something else, is anyone's guess, as it provided no guidelines, standards, or framework for defining or enforcing the term "staple groceries."

The fact that a vague statutory term is capable of definition does not mean that it is constitutional. A statutory definition must spring from the legislature itself, not from a regulatory agency that is itself admittedly "confused" as to what the legislature meant. Party Source's contention to the contrary is unavailing.

### 8. Unconstitutional Laws Cannot Survive Because They Allegedly Have Good Results.

The last ten pages of Party Source's brief do not address any of the constitutional issues actually at hand in this case. Instead, those ten pages present a mish-mash of "Hail Mary" arguments in which Party Source tries to convince this Court not to strike down KRS 243.230(5) and 804 KAR 4:270 because striking down those laws "can only lead to greater alcohol problems." Specifically, Party Source contends that regardless of their constitutionality the laws at issue should be upheld (1) to prevent an overall increase in alcohol consumption, (2) because "package stores" are allegedly better at stopping underage sales than other stores, (3) to prevent the 24-hour sale of wine and liquor, and (4) to discourage future challenges to other provisions of the ABC Act. None of these last-ditch arguments have any merit.

### A. It Does Not Matter That An Increase In Consumption *Might* Result From The Invalidation of KRS 243.230(5) and 804 KAR 4:270.

Party Source and its expert, Pamela Erickson, offer an "ends justify the means" argument in support of KRS 243.230(5) and 804 KAR 4:270. Namely, they suggest that the laws at issue suppress alcohol use, and thereby suppress the societal problems related to alcohol, and therefore should be left alone [Dkt. 40-1 pp. 28-32].

The primary problem with this argument, of course, is that the ends of a law never justify unconstitutional means. Even if Party Source were correct that the laws at issue suppress alcohol

use – and there is no proof of that – the effect cannot be accomplished through arbitrary discrimination. For instance, school overcrowding is a major problem throughout the United States. One way to accomplish the goal of reducing overcrowding in some communities, or universities, would be to simply deny admission to children with a certain skin color. The problem with such a plan, however, is that it employs an unconstitutional means to reach the worthy end of reducing overcrowding. Any such law must be struck down, even if the result is school overcrowding. The government must accomplish its legitimate goals by constitutional means. Therefore, in this case, while reducing or limiting alcohol consumption may be a worthy and laudable governmental goal, the state cannot accomplish that goal by arbitrarily excluding a class of similarly situated retailers from the wine and liquor market. Instead, the state must address the problem through constitutional means, such as making fewer licenses available, raising taxes, or even taking state control of *all* wine and liquor sales.[9]

Party Source and Ms. Erickson, however, contend that if Plaintiffs are allowed to apply for wine and liquor licenses, there will be a wine and liquor outlet on every street corner in Kentucky [*id.*]. Party Source argues that the "dangers of allowing such high proof alcohol to be sold on every corner there is a grocery store, gas station, and/or convenience stores should be readily apparent" [*id.* at 32]. The fatal flaw in this argument – in addition to being unsupported by any facts – is that Kentucky law will not permit alcohol to be sold on every street corner. As Party Source repeatedly points out, wine and liquor are sold under a "quota system" in Kentucky, meaning that Kentucky law has capped the number of available wine and liquor licenses. The quota laws will not change if KRS 243.230(5) and 804 KAR 4:270 are invalidated. All that will

---

[9] One might wonder whether Party Source would be quite as understanding of efforts to limit alcohol sales if the legislature sought to accomplish that goal by, for example, banning the sale of wine and liquor in stores larger than 25,000 square feet.

change is that there will be a larger pool of retailers who can apply for the same limited numbers of licenses – all of which can be legally obtained. Kentucky's quota/cap system, by its very nature, prevents there from being a liquor store on every corner as Party Source and its expert suggest. The quota laws will survive any invalidation of KRS 243.230(5) and 804 KAR 4:270, and represent an unequivocal declaration as to the number of wine and liquor retailers that Kentucky deems to be acceptable. And regardless of the number of outlets there may ultimately be, the Constitution commands that if a corner drug store can apply for a wine and liquor license, a corner grocery store must be allowed to apply for a wine and liquor license as well. The desire to make alcohol less accessible does not justify arbitrary discrimination between similarly situated retailers.

What is more, Party Source (again perhaps unwittingly) offers evidence strongly indicating that there will ***not*** be a significant increase in alcohol consumption if KRS 243.230(5) and 804 KAR 4:270 are overturned. Specifically, Party Source offers the report of William Alan Bartley, Ph.D., an economics professor at Transylvania University [Dkt. 40-5 pp. 40-53].[10] Party Source and its "package store" allies apparently hired Dr. Bartley in 2010 to study the economic effects of introducing wine sales in Kentucky grocery stores. They did so to enable their lobbyists to present Dr. Bartley's findings to the legislature. Dr. Bartley's report is very interesting. Specifically, Dr. Bartley reviewed numerous studies of situations where wine was introduced into grocery stores in other states, and ultimately concluded that he would expect "relatively little change" in Kentucky wine consumption if grocery stores were allowed to sell it

---

[10] Party Source attempts to "back door" this report of this non-disclosed expert into evidence through the affidavit of Karen Lentz. The deadline for final expert disclosures was October 1, 2011 [Dkt. 15], and Dr. Bartley was not disclosed by that date. Nonetheless, because Dr. Bartley's report severely undermines many of Party Source's basic premises, Plaintiffs are pleased for this Court to consider it for purposes of this motion.

[*id.* at pg. 41-44].   Dr. Bartley explains that when a state changes from a "control" model (meaning that the state controls *all* alcohol sales) to licensing sales in grocery stores, wine sales increased the most because "the number of wine outlets increased dramatically, but even then, for relatively short periods of time before returning closer to pre-legislation levels" [*id.* at 44]. Dr. Bartley then explains that in systems where the sale of wine was first limited to traditional "package stores," but then introduced into grocery stores, that "demand increased very little, or none" [*id.*].   Dr. Bartley concluded that "the latter scenario is closest to that which will likely be experienced in Kentucky" [*id.*].

Accordingly, Party Source meets itself coming and going.   While Party Source and its expert, Ms. Erickson, speculate that allowing Plaintiffs to sell wine and liquor will result in increased consumption, Party Source cannibalizes its own speculation with Dr. Bartley's report, which concludes exactly the opposite.   But again, whether invalidation of the laws at issue would result in an increase in consumption does not matter, because a valid state objective cannot be accomplished via unconstitutional laws.

Finally, Plaintiffs cannot help but note that Party Source's purported concern about "alcohol problems" and "increased consumption" ring somewhat hollow considering that Party Source is the largest wine and liquor store in the state [Dkt. 40-6 ¶ 9].   If Party Source truly wanted to reduce the availability of alcohol in Kentucky, as it claims it does, it would not have filed the lawsuit culminating in *Liquor Outlet, LLC v. Alcohol Beverage Control Board*, 141 S.W.3d 378 (Ky. App. 2004), which succeeded in forcing Sunday sales of wine and liquor.   And if Party Source really wants to reduce the availability today, it could simply stop selling wine and liquor and scrap its plans to open a new distillery.   But it has not done so, and will not do so, because selling wine and liquor is a profitable enterprise.   And it is even more profitable when

20

similarly-situated retailers, such as Coalition members, are excluded from the market by arbitrary discrimination.  Truth be told, Party Source would love to see an increase in the consumption of wine and liquor – it just wants those purchasing wine and liquor in its area to be coerced by law to make their purchases from Party Source and its allies instead of from nearby grocery stores. And it now seeks to uphold arbitrary laws that force consumers to do just that.

> **B.**   **Kentucky Does Not Have a System Where Wine and Liquor Are Sold Only at "Package Stores."**

There is a stunningly dishonest premise that pervades Party Source's brief, as well as *all* of the affidavits and the expert report that Party Source provides to this Court.  That dishonest premise is that Kentucky law limits the sale of wine and liquor to "package stores" who primarily sell alcoholic beverages.  Party Source suggests that this "package liquor store concept" exists in Kentucky and should be preserved because Party Source posits that this "concept" is effective at preventing underage sales [Dkt. 40-1 pp. 29-36].

The truth, however, is that the "package liquor store concept" does not exist in Kentucky, as wine and liquor sales are not limited to alcohol-centric "package stores" as Party Source and its affiants repeatedly suggest.  Instead, a wine and liquor license can be obtained by *any retailer* who does not make "staple groceries" or gasoline more than 10 percent of their monthly sales. KRS 243.230(5), 804 KAR 4:270.  Accordingly, retailers such as Walgreens, CVS, and Rite-Aid, who sell numerous lines of products, including "staple groceries," can and do obtain retail package licenses, and sell both wine and liquor.

Party Source and its affiants turn a blind eye to this reality and pretend as though Kentucky's ABC Act limits wine and liquor sales to "package stores" where "minors are not allowed."  Affiant Donald R. Cole, a lobbyist for a temperance league, bemoans that allowing wine and spirit sales in stores "where minors are free to come and go with no restriction allows

them to become familiar with access to alcohol and immune to the special nature of alcohol as a product and view it as just another consumer product on the shelves" [Dkt. 40-24 ¶ 20]. Liquor Barn President Roger Leasor states that "grocery stores and convenience stores have no mechanism that I am aware of to keep anyone under the age of twenty-one out of the stores" [Dkt. 40-20 ¶ 22]. Along these lines, Party Source and its affiants also claim that "package stores have policies of asking for age verification identification for anyone appearing underage in the store," which they contend cannot happen in stores where minors are allowed [Dkt. 40-1 p. 32].[11] Party Source and its affiants also point out that "package store" employees must be at least 20 years of age, whereas grocery stores can employ teenagers [Dkt. 40-20 ¶ 23; Dkt. 40-5 ¶ 19].

The fatal flaw in this argument, of course, is that wine and liquor are already sold by Kentucky retailers in stores where "minors are allowed." There are no age restrictions for customers entering licensees such as Walgreens, CVS, and Rite-Aid – just as there are not in grocery stores or convenience stores. KRS 244.085(7). Moreover, teenagers work in retailers such as CVS, Walgreens, and Rite-Aid, and those retailers certainly do not ask for identification from "anyone appearing underage in the store."

Undeterred by reality, Party Source and its affiants suggest that limiting wine and liquor sales to "package stores" is rational because "package stores" cannot afford to have their license suspended for selling to underage buyers, as such a suspension would effectively shut down their business. In other words, Party Source and its affiants contend that grocery stores are better able

---

[11] Liquor Barn President Roger Leasor actually stated that "*Liquor Barn* has a policy of asking for age verification identification for anyone appearing underage in the store" [Dkt. 40-20 ¶ 21]. He did not state that *all* liquor stores in Kentucky have such "policies" in place as Party Source's brief attributes to him.

to weather a license suspension due to their diversified product base, and Party Source's affiants therefore conclude, **without any evidence**, that grocery stores are somehow less motivated to prevent underage sales [Dkt. 40-5 ¶ 20; 40-6 ¶ 15].

This argument also fails as a matter of law.  Not only is it rank speculation, the fact is that Kentucky law does not limit wine and liquor sales to alcohol-centric "package stores" whose entire business relies upon a retail package license.  The Court need look no further than Walgreens, CVS, or Rite-Aid – all of which sell wine and liquor in Kentucky, and none of which would likely have to shut down if their retail package license were suspended.  As the most recent 10-K reports for these "drug stores" confirm, these retailers rely most heavily on the sale of prescription medication – not alcohol [*see*, *e.g.*, Dkt. 41-24 p. 8, where CVS's 10-K shows that 68% of its revenues are from prescription drug sales].  Accordingly, Party Source's suggestion that grocery stores should be discriminated against because they have a diversified product base must fail as a matter of law.  So long as Kentucky retailers with diversified product bases, such as CVS, can apply for and obtain a retail package license, all similarly situated retailers, such as grocery stores, are constitutionally entitled to do so as well.

Finally, and again without any supporting proof, Party Source and its affiants suggest that "package stores" train their employees better than grocery stores when it comes to alcohol sales, and therefore contend that grocery stores should not be allowed to sell wine and liquor.  Party Source even makes the blanket allegation that "liquor stores and restaurant/bars have employees specifically trained to identify when a patron is possibly impaired and should not be allowed to purchase additional alcohol.  Such training does not exist for grocery stores or convenience stores now" [Dkt. 40-1 p. 33].

Party Source's blanket allegation that all "grocery stores" and "convenience stores" in Kentucky do not train their employees regarding illegal sales of alcohol is absolutely false (and borders on offensive). Tellingly, this all-encompassing declaration is based *entirely* upon the "understanding" of temperance lobbyist Donald Cole – an individual with no stated experience in the grocery store industry (or the "package store" industry), and an individual who has not been designated as an expert witness by Party Source [Dkt. 40-1 p. 33; Dkt. 40-24 ¶¶ 22-23]. Suffice it to say, Mr. Cole's declaration about his "understanding" of the grocery store industry – whatever that may be – does not give Party Source any right to falsely declare that grocery stores and convenience stores in Kentucky do not train their employees when it comes to improper sales.

Moreover, Mr. Cole's "understanding" is demonstrably false. It is undisputed that Lexington-Fayette Code of Ordinances Chapter 3-28 requires "*[a]ny person* who sells or serves *alcoholic beverages* in a licensed retail establishment or in any premise where alcoholic beverages are sold or served by the holder of a caterer's or special event license shall participate in and successfully complete a responsible beverage service training program."[12] The term "alcoholic beverages" includes malt beverages, meaning that Coalition grocery stores in Lexington who are licensed sell beer must provide their employees with this mandated training in order to maintain their malt beverage license. And they do – a fact confirmed by Coalition members' currently valid licenses to sell beer in Fayette County [*See*, *e.g.*, Ex. V, ABC Report

---

[12] In fact, Liquor Barn President Roger Leasor takes partial credit for the enactment of this ordinance, which applies to all "alcohol retailers" – not just wine and liquor retailers [Dkt. 40-20 ¶ 9].

showing Kroger stores currently licensed to sell beer in Fayette County].[13]   And the same is true all across the state – grocery stores who sell beer, like liquor stores and drug stores, provide *all* of the training that state and local authorities require as a prerequisite for selling alcohol. Accordingly, responsible beverage service training *is not*, and never will be, solely in the province of "package stores" as Mr. Cole and Party Source groundlessly suggest.

Moreover, Party Source offers absolutely no proof showing that stores such as Walgreens, CVS, or Rite-Aid will provide more training to their employees in the prevention of underage sales than similarly situated grocery stores will provide if the grocery stores are allowed to sell wine and liquor.   Any suggestion to that effect would be silly, as *any* licensee must provide the training that the state and local authorities require to keep its license, and there would be no exceptions for Coalition members.   A grocery store will have to provide exactly the same training to its employees that a CVS or a Liquor Barn must provide to its employees.

Accordingly, Party Source's attempted reliance on the "package liquor store concept" fails as a matter of law because the "concept" does not exist in Kentucky.   So long as a Rite-Aid, a gun store, or any other store with a diversified product base can apply for and obtain a retail package license, a similarly situated grocery store must be allowed to do so as well.

      C.    **Ending the Arbitrary Discrimination At Issue Will Not Result In Wine and Liquor Being Sold 24 Hours a Day.**

Party Source and its affiants also suggest that if KRS 324.230(5) and 804 KAR 4:270 are declared unconstitutional grocery stores and convenience stores will sell wine and liquor 24 hours a day:

---

[13]   This report can be found on the ABC Board's website at the following address: https://dppweb.ky.gov/ABCStar/Config/Kentucky/ABCOnline/Pages/KyViewReport.aspx.

> If a gas station or convenience store is allowed to begin selling wine and distilled spirits, the current limits on accessibility to alcohol based on a package liquor store's practical or legislatively controlled hours of operation will be non-existent, because you have many grocery stores and convenience stores that are open twenty-four hours a day, seven days a week.

[Dkt. 40-1 p. 34. *See also* Dkt. 40-24 ¶ 18].

This contention is absolutely false.  Kentucky currently has a statute, KRS 244.290, that specifically addresses the hours that distilled spirits and wine can be sold.  Namely, it holds that a licensed premises shall not be open while polls are open, or between the hours of midnight and 6 a.m., unless the "licensee provides a separate locked department in which all stocks of distilled spirits and wine are kept during those times."  *Id.*  That law is not being challenged in this lawsuit, and will remain in effect even if KRS 324.230(5) and 804 KAR 4:270 are invalidated.  In fact, numerous Kentucky wine and liquor licensees are already open 24 hours a day, such as the Walgreens at 9409 Shelbyville Road in Louisville [See Ex. W hereto].  Presumably, this Walgreens and similar 24-hour retailers follow the law and lock up all of their wine and liquor from midnight to 6 a.m. daily.  Accordingly, Party Source's suggestion that "the current limits" on "hours of operation will be non-existent" if Plaintiffs' succeed in this case is alarmingly dishonest.

Plaintiffs also cannot help but note how hypocritical Party Source's purported desire to protect statutory limits on hours of operation really is considering that, as previously noted, Party Source sued the ABC Board to expand the sale of wine and liquor to Sundays.  *Liquor Outlet, LLC v. Alcohol Beverage Control Board*, 141 S.W.3d 378 (Ky. App. 2004).   When Party Source's action succeeded, the Cincinnati Enquirer reported that "[o]perators of the liquor mega-store say they will celebrate the easing of liquor regulations with a ribbon-cutting and sale at noon this Sunday" [Ex. X, Jim Hannah, *Sunday Liquor Sales to Start*, CINCINNATI ENQUIRER, September 10, 2004].  As that case, and the resulting ribbon-cutting celebration confirm, Party

Source is not really interested in protecting laws that limit the hours that wine and liquor can be sold.  Instead, Party Source is interested in protecting laws that shield it and its allies from competition by arbitrarily prohibiting similarly situated retailers from accessing the wine and liquor market.

> D.   Striking Down KRS 324.230(5) and 804 KAR 4:270 Will Not Result In The Invalidation of the Entire ABC Act.

Unable to proffer any justification for the discrimination now at issue, Party Source tries to portray Plaintiffs' claims as an attempt to invalidate the entire ABC Act.  Party Source projects a parade of horribles in speculating that this is only the first lawsuit in what will be a long line of attacks by Plaintiffs against the constitutionality of provisions of the ABC Act.  Without any factual basis whatsoever, Party Source suggests that Plaintiffs' ultimate goal is to entirely deregulate alcohol sales in Kentucky, and that this lawsuit is the first step in their master plan:

> [I]t is naïve to believe that if [Plaintiffs] win this suit that Plaintiffs will not continue their constitutionality attack on alcohol laws and regulations that interfere with their unfettered ability to sell wine and spirits.

[Dkt. 40-1 p. 35].  Party Source also speculates that if Plaintiffs are successful in this suit that the Court can expect Plaintiffs to "lobby to sell these products at all hours they are open for business, [and] they will want to use clerks as young as 18 and engage in discounting and advertising designed to increase sales" [*id.*].  Party Source states, without any citation, that such a "'domino effect' is a very real concern for experts and professionals in the alcohol industry" [*id.*].

Party Source's "Chicken Little" contention is groundless.  Whether Plaintiffs and this Court are naïve is beside the point.  As the pleadings in this case establish, the entire ABC Act is not being challenged in this lawsuit.  In fact, ***every other provision*** of the Act, including quota on licenses, price floors, hours of sale, and advertising, will all remain in place if KRS 243.230(5) is

nullified.  Moreover, the ABC Act, as a whole, has already survived numerous Court decisions invalidating specific unconstitutional provisions therein.  *See*, *e.g.*, *Kentucky ABC Board v. Burke*, 481 S.W.2d 52 (Ky. 1972).  And just as before, the ABC Act, as a whole, will survive this lawsuit even if KRS 243.230(5) is invalidated.  If the Coalition members are successful in this lawsuit, and obtain licenses to sell wine and liquor, they will have to follow the same rules and regulations that Walgreens, CVS, Rite-Aid, and Party Source are already required to follow.  In fact, liquor store lobbyist Karen Lentz confirms this in her affidavit attached to Party Source's motion, stating that if Plaintiffs' suit is successful "grocery stores, convenience stores, and gas stations will still have to apply for and receive a retail package license under the existing quota system and will have to comply with the employee age restrictions" [Dkt. 40-5 ¶ 16].

There is no evidence that Plaintiffs have any plans or intention to attack any other provisions of the ABC Act.  Party Source's rank speculation to the contrary is a figment of its imagination.  But even if a grocery store were to bring a future lawsuit challenging the constitutionality of another portion of the ABC Act – just as Party Source attacked laws prohibiting Sunday sales – it has a right to do so.  And if any other provision of the ABC Act is unconstitutional, it *should* be nullified.  In other words, if this case leads to a "domino effect" of unconstitutional laws being struck down, that is a *good* thing.  But it will not, as Plaintiffs have no reason to believe that the vast majority of the ABC Act is unconstitutional.  Plaintiffs only ask to be eligible to apply for, and perhaps obtain, a wine and liquor license so that they can sell those products within the existing framework of the ABC Act.

Finally, the fact that Plaintiffs *might* seek legislative changes to the ABC Act in the future is perfectly fine.  Every citizen can petition its representatives to change laws.  That is American democracy.  Such action should be encouraged, not discouraged.  The mere possibility

that Plaintiffs may later engage their legislators in regards to the ABC Act has absolutely no bearing on the case now before this Court.   Party Source's contention that such action is somehow problematic is amusing considering that Party Source and its allies have not hesitated to make their wants and desires known to the Kentucky legislature, and considering that Party Source now asks for summary judgment based upon the affidavits of two *lobbyists*.

Therefore, Party Source's suggestion that KRS 324.230(5) and 804 KAR 4:270 should be upheld to discourage future change to the ABC Act is groundless.   The fact that Party Source even makes this argument only confirms that there is no rational basis, much less a substantial or justifiable reason, for the arbitrary discrimination at issue in this lawsuit.

## <u>CONCLUSION</u>

There is no rational basis, nor any substantial and reasonable justification, for the Kentucky statute and regulation that prohibit grocery stores from obtaining a license to sell wine and liquor.   KRS 243.230(5) and 804 KAR 4:270 provide a textbook violation of the equal protection and due process guarantees of both the Federal and Kentucky Constitutions. Moreover, KRS 243.230(5) is void for vagueness.   Accordingly, Party Source's motion for summary judgment should be denied.   As requested by Plaintiffs in their motion for summary judgment, KRS 243.230(5) and 804 KAR 4:270 should be declared unconstitutional and void as a matter of law.

Respectfully submitted,

s/  Christopher W. Brooker
M. Stephen Pitt
Christopher W. Brooker
WYATT, TARRANT & COMBS, LLP
500 W. Jefferson Street, Suite 2800
Louisville, Kentucky  40202
502.589.5235
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

It is hereby certified that on this 30th day of January, 2012, a copy of the foregoing was served electronically via the CM/ECF filing system upon the following:

Peter F. Ervin, Esq.
General Counsel
Public Protection Cabinet
Capital Plaza Tower
500 Mero Street
5th Floor
Frankfort, Kentucky  40601

Kenneth S. Handmaker, Esq.
Kevin L. Chlarson, Esq.
Loren Prizant, Esq.
Middleton Reutlinger
2500 Brown & Williamson Tower
Louisville, Kentucky  40202

s/ Christopher W. Brooker
One of Counsel for Plaintiffs

60115732.2

30