UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
*Electronically Filed*

| | | |
|---|---|---|
| MAXWELL'S PIC-PAC, INC., et al. | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:11-CV-18-H |
| | ) | |
| TONY DEHNER, et al. | ) | |
| | ) | |
| DEFENDANTS | ) | |

**PLAINTIFFS' REPLY TO PARTY SOURCE'S
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' equal protection argument is simple:  There is no rational basis, much less a substantial and justifiable reason, for a law that allows a retailer such as Rite-Aid to be licensed to sell wine and cheese in the same transaction but not a ValuMarket, simply because a ValuMarket sells proportionally more "staple groceries" than Rite-Aid.  Intervening Defendant Liquor Outlet, Inc. ("Party Source") does not want to compete with grocery stores and convenience stores in the wine and liquor business, and therefore has filed 71 pages of briefing attempting to protect this arbitrary discrimination.  But nowhere in those 71 pages does Party Source articulate a rational basis for this arbitrary discrimination between similarly situated retailers.

1.      **Party Source Fails To Proffer Any Justification for Discriminating Between "Grocery Stores" and "Drug Stores" Regarding the Sale of Wine and Liquor.**

The only justification that Party Source offers for allowing "drug stores" like CVS, Walgreens, and Rite-Aid to sell wine and liquor, but not "grocery stores" and "convenience stores," is that "drug stores have always sold alcohol," and "it is reasonable for drug stores to

hold package liquor licenses given their long experience with selling alcohol and their experience in selling highly controlled products" [Dkt. 44 p. 10].  This justification is groundless. Common experience teaches that "drug stores" have evolved over time to the point that they do not look, or operate, anything like the way they did 50 years ago.  In today's world "drug stores" essentially have small grocery stores in front of their pharmacy, with checkout lanes at the front of the store that handle the sale of groceries and general merchandise items, including wine and liquor.  And the checkout clerks at the front of "drug stores" like Rite-Aid are ***not*** pharmacists and have no special "experience in selling highly controlled products."  Instead, they are checkout clerks identical to checkout clerks at grocery stores or convenience stores who scan bar codes and bag merchandise.  The mere fact that "drug stores" like CVS have a pharmacy at the back of the store does not mean that the checkout clerks at the front of the store are any more capable of preventing illegal sales of wine and liquor than checkout clerks at the front of a grocery store.  After all, checkout clerks in "drug stores" who sell wine and liquor verify that a customer is over 21 ***in exactly the same way*** checkout clerks at "grocery stores" verify that a customer is over 21 when selling beer.  And grocery store checkout clerks have been verifying beer purchasers' ages in connection with the sale of beer for decades.

Moreover, some Coalition members have pharmacies in their grocery stores, and have had such pharmacies for years.  Accordingly, to the extent it matters (and it does not), those Coalition members have just as much "expertise in selling highly controlled products" as a Walgreens, CVS, or Rite-Aid.  In fact, the categories of products sold at retailers such as Walgreens, CVS, or Rite-Aid almost completely overlap with those sold at Kroger, ValuMarket, and Food City.  The only difference is that Coalition members just happen to sell more "staple groceries" than a Walgreens, CVS, or Rite-Aid.

Plaintiffs are not suggesting that Walgreens, CVS, or Rite-Aid should be prohibited from selling wine and liquor.  Plaintiffs simply contend that so long as "drug stores" are allowed to sell wine and liquor that similarly situated Coalition members must be allowed to do so as well. There is simply no rational basis for excluding a retailer from the universe of retailers who can apply for and obtain one of the limited number of wine and liquor licenses based upon the percentage of "staple groceries" that it sells.

2.      **The Existence of Self-Checkouts at *Some* Grocery Stores Does Not Justify the Discrimination Against *All* Grocery Stores in KRS 243.230(5) and 804 KAR 4:270.**

Having nothing else to lean on, Party Source continues to suggest that the existence of self-checkouts in *some* grocery stores in Kentucky provides a rational basis for excluding *all* Kentucky grocery stores and convenience stores from the wine and liquor market.  Without any supporting proof, Party Source suggests that self-checkouts are used by underage drinkers to purchase alcohol more frequently than at traditional checkouts, and that "[p]roblems with self-checkouts have led to the ban of self-checkouts for alcohol sales in California" [Dkt. 44 p. 15].[1]

While California has indeed banned the sale of alcohol through self-checkouts, the fact that it did so does not mean that there was actually a problem with underage sales at self-checkouts in California.  As the LOS ANGELES TIMES article that Party Source attached to its response reports, the California "state Department of Alcoholic Beverage Control said it had no

---

[1] Plaintiffs' Expert John O. Hinman explains in his supplemental report how the California-based studies cited by Party Source do not actually support the proposition that self-checkouts present an increased risk of sales to minors, but instead demonstrate that self-checkouts are just as effective, if not more so, in the prevention of underage sales [Dkt. 41-40 pp. 8-9].  Furthermore, Party Source's speculation should not be afforded any more weight than the United States Supreme Court gave to the State of Michigan's unsupported conjecture in *Granholm v. Heald* that on-line wine sales would result in greater consumption by minors.  544 U.S. 460, 490 (2005).

enforcement difficulties with self-service check-outs," and the bill's passage was "a victory for the United Food and Commercial Workers union" – a union with a vested interest in the employment of checkout clerks as opposed to self-scanning machines [Dkt. 44-7 p. 2].

But even if there is a problem with underage sales at self-checkouts as Party Source suggests, such a problem must be addressed by a law that actually relates to the alleged problem – not one that is arbitrarily overinclusive and underinclusive.   The relationship between a statute and its goal cannot be "so attenuated as to render the statute arbitrary and irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W.3d 408, 422 (Ky. 2005).  California's new law passes that test, as it bans ***all*** alcohol retailers from selling ***any*** alcohol through self-scanning machines:

> No privileges under an off-sale license shall be exercised by the licensee at any customer-operated checkout stand located on the licensee's physical premises.

CAL. BUS. & PROF. CODE § 23394.7(2).

KRS 243.230(5), on the other hand, fails that test.   The statute is unreasonably overinclusive and underinclusive.  Specifically, KRS 243.230(5) is overinclusive because it bans all retailers for whom a "substantial part of the commercial transaction" happens to be "staple groceries" or "gasoline and lubricating oil" from selling wine and liquor, regardless of whether they use self-checkout machines.  The law therefore forbids Maxwell's Pic-Pac, and hundreds of other Kentucky grocery and convenience stores that do not utilize self-scanners, from selling wine and liquor.  California's new law does nothing of the sort.  Instead, it allows grocery stores to sell wine and liquor, but now prohibits them, and ***all*** other alcohol retailers, from selling ***any*** alcohol through self-scanning machines.  Therefore, if Maxwell's Pic-Pac were in California, it could sell wine and liquor and would not be impacted in any way by California's new law, which is not overinclusive.

KRS 243.230(5) is also impermissibly underinclusive because it allows **any** current or future wine and liquor licensee in Kentucky to use self-checkout devices to sell wine and liquor. Under Kentucky law a "drug store" such as CVS could install a self-checkout machine at one of its Kentucky stores **today** (if it has not already done so) and use that machine to sell wine and liquor. Party Source's only response to this reality is to fault Plaintiffs for not producing evidence showing that a current Kentucky wine and liquor retailer has plans to install self-checkouts machines [Dkt. 44 pp. 15-16]. Again, Party Source misses the point. Even if no current wine or liquor retailer in Kentucky currently uses self-checkout devices, or has drawn up plans to do so, the fact that they **can do so** renders KRS 243.230(5) arbitrarily underinclusive if the statute's purpose is to combat underage sales through self-scanners.

And the proposition that retailers like Walgreens, CVS, and Rite-Aid will likely install self-scanners in Kentucky is no stretch. As the December 9, 2011 BOSTON GLOBE story at Exhibit Q to Plaintiffs' motion for summary judgment [Dkt. 41-42] makes clear, CVS has already installed self-checkout in 200 of its over 7,300 stores, and "by the end of this year, CVS expects to complete redesigns in 420 of its 7,300 stores **nationwide**. The company declined to say how many of the revamped stores are in Massachusetts" [*id.* (emphasis added)]. There is nothing preventing CVS from "revamping" one or more of its Kentucky stores with self-scanners and selling wine and liquor therefrom. While Party Source tries to dismiss this article as only being "an article about certain CVS pharmacies in Boston starting to use self-checkouts," the article actually establishes that CVS, a company with dozens of wine and liquor licenses in Kentucky, has embarked on a plan to outfit hundreds of its stores **nationwide** with self-scanners. And those self-scanners could legally be used to sell wine and liquor in Kentucky.

Finally, Party Source's self-checkout argument is facially ridiculous considering that Kentucky law currently allows grocery stores to sell beer and malt liquor through self-checkouts, and they do so every day.  Kentucky's legislature and ABC Board have taken no steps to address the alleged problem of underage sales through self-checkouts because ***it does not exist***.  There is absolutely no proof that allowing wine and liquor to be sold in the same manner that beer and malt liquor are already sold in Kentucky will result in an increase in underage sales.  The suggestion that self-scanners pose a problem is nothing more than the wishful thinking of a liquor store that does not want to compete with grocery stores in the wine and liquor market.

The bottom line is that if underage sales through self-checkouts is a problem (and it is not), Kentucky cannot fight the problem with a law that arbitrarily excludes ***all*** grocery stores and convenience stores from the wine and liquor market, while at the same time allows those who actually sell wine and liquor in Kentucky to utilize self-checkouts whenever and wherever they want.  The connection between KRS 243.230(5) and this purported goal – if it is actually a goal of the law – is so attenuated as to render the statute arbitrary and irrational.

### 3. The Fact that Plaintiffs Would Advertise Wine and Liquor If They Obtain Licenses to Sell It Makes No Difference In This Case.

Party Source next posits that "if KRS 243.230(5) would be struck down, any concerns regarding future Kentucky consumer bombardment by alcohol advertising and easily accessible alcohol in grocery stores alone are valid" [Dkt. 44 p. 16].  Party Source even had its expert, Pamela Erickson, take pictures of "in-store advertisements" of wine in Arizona grocery stores, apparently to show the Court that in the 34 states like Arizona, Indiana, and Ohio, where grocery stores can sell wine, grocery stores present wine in an attractive manner in an attempt to induce shoppers to purchase it.  Party Source suggests that such a practice – *i.e.*, basic marketing – is atrocious and that Kentuckians should be protected from it.

Apparently Party Source contends that the massive amount of "alcohol advertising" that it and its fellow retailers like Liquor Barn, Walgreens, Rite-Aid, and CVS "bombard" Kentucky consumers with on a daily basis is perfectly fine, but that anything more would be unacceptable [*see*, *e.g.*, Dkt. 42-2 through 42-21 and Dkt. 42-37 through 39]. Party Source apparently believes that Kentucky consumers could not possibly handle Kroger, ValuMarket, or Houchens running advertisements for wine and liquor virtually identical to those that CVS, Walgreens, and Liquor Barn already run, and that Kentucky consumers could not handle the marketing of wine inside of grocery stores where beer is already marketed and sold (even though people living across the river in Indiana and Ohio seem to handle it just fine).

If Plaintiffs are successful in this lawsuit, and Coalition members ultimately obtain wine and liquor licenses, they will unapologetically market wine and liquor as best they can within the boundaries of the law. They will compete head-to-head with Walgreens, CVS, and Party Source on the sale of these items, just as they already do in the sale of beer and "staple groceries." They will display the product nicely in their stores, and will feature these products in their advertising circulars – just like Walgreens, CVS, and Liquor Barn already do. And there is absolutely nothing wrong with that.

The reason Party Source provides this Court with numerous pictures of wine displays in Arizona grocery stores is that it hopes to distract this Court from a picture that almost any Kentuckian in a "wet" city or county can quickly conjure up from memory – a picture of the interior of a Kentucky CVS, Rite-Aid, or Walgreens where wine and liquor are displayed alongside "staple groceries" and numerous other products, such as soft drinks, candy, and ice cream, and then sold in the same transaction as the grocery items – all in a store where minors are welcome at any hour of the day [*see*, *e.g.*, Dkt. 41-41, p. 4]. It is that picture, which can be

snapped any day in "drug stores" in wet Kentucky counties, that renders KRS 243.230(5) and 804 KAR 4:270 unconstitutional.  So long as Kentucky allows retailers such as Walgreens, CVS, and Rite-Aid to apply for and obtain one of Kentucky's limited number of wine and liquor licenses, it must allow similarly situated retailers who just happen to sell a "substantial" amount of "staple groceries" to apply for that same license.  The fact that ValuMarket's bottom-line relies more on "staple groceries" than prescription medication does not provide any rational basis for prohibiting ValuMarket from applying for a wine and liquor license.

**4.  Plaintiffs Have Correctly Stated the Equal Protection Standards of Review In This Case.**

Party Source spends four pages of its brief arguing that the 21st Amendment requires that KRS 243.230(5) be analyzed under the lowest level of constitutional review – a rational basis review [Dkt. 44 pp. 17-20].  It is curious that Party Source spends so much time making this point because in regards to the United States Constitution, that point is undisputed.  That said, *Cleburne* and other seminal cases teach that no law can arbitrarily discriminate between similarly situated individuals, even if the law deals with alcohol.  And here there is no rational basis for the discrimination embodied in KRS 243.230(5) and 804 KAR 4:270.  Banning Coalition members from selling wine and liquor simply because they sell "substantial" amounts of "staple groceries" or "gasoline" is as arbitrary as banning a retailer from selling wine because their name starts with the letter "A," or because their business is located on the south side of a street.

Contrary to Party Source's suggestion, Plaintiffs have never once argued that the heightened standard of review reserved for race or sex cases should be applied here.  Plaintiffs did not cite to *Brown v. Bd. of Education* to establish the standard of review, but instead to illustrate the absurdity of Party Source's arguments, such as its contention that Plaintiffs' claims are time-barred, and that Plaintiffs lack standing.

8

As for the standard of review under the Kentucky Constitution, that is a bridge that this Court should never have to cross, as KRS 243.230(5) fails as a matter of law under the Federal "rational basis" standard.   Nonetheless, if KRS 243.230(5) does not fail under the Federal "rational basis" standard, it is clear that Kentucky's Constitution requires that a higher standard of review be applied to KRS 243.230(5) because it concerns social and economic policy:

> Instead of requiring a "rational basis," we have construed our Constitution as requiring a "reasonable basis" or a "substantial and justifiable reason" for discriminatory legislation in areas of social and economic policy.

*Elk Horn Coal Corp. v. Cheyenne Resources*, 163 S.W.3d 408, 418-419 (Ky. 2005).

Party Source obviously does not want a heightened equal protection standard to be applied to KRS 243.230(5).  Accordingly, it argues that Kentucky's heightened standard is solely the result of Section 59 of the Kentucky Constitution, and then posits that because Plaintiffs' Amended Complaint does not specifically reference Section 59, that no heightened equal protection standard can apply here [Dkt. 44 pp. 20-22].   This argument is groundless. Kentucky's Supreme Court never declared that Section 59 is the sole foundation of Kentucky's heightened equal protection standard.  Instead, it declared that Kentucky has a higher standard because "[t]he Kentucky Constitution's Equal Protection provisions, Section 1, 2, and 3, are much more detailed and specific than the Equal Protection Clause of the United States Constitution.   Moreover, the equal protection provisions of the Kentucky Constitution are enhanced by Section 59 and 60." *Id.* at 418.  Accordingly, the heightened standard is not solely the product of Section 59 as Party Source suggests.  And here, Plaintiffs have made it clear that they are alleging a violation of "State Equal Protection" [Amended Complaint, Dkt. 37 p. 7]. That allegation alone establishes that Plaintiffs are relying on any and all equal protection guarantees that the Kentucky Constitution provides.   Party Source's attempt to parse the pleadings at this late stage to escape Kentucky's heightened equal protection should be rejected.

But again, Plaintiffs submit that this issue is ultimately academic because KRS 243.230(5) fails under the Federal rational basis review, meaning this Court should not even have to address the heightened Kentucky standard.

**5.      Party Source's Continued Attempt to Defeat Plaintiffs' Equal Protection Claim With a "Choice" Argument Falls Flat.**

Unable to proffer any justification for the discrimination at issue, Party Source continues to try to defeat Plaintiffs' Equal Protection claims with its "choice" argument, wherein it claims that a retailer chooses what goods it will sell, and if it chooses to make "staple groceries" and/or gasoline more than ten percent of its business, it has thereby chosen not to sell wine or liquor:

> At the end of the day, the issue is about a decision made as to what industry within which a retailer has chosen to work.  Grocers are in the grocery business, liquor stores are in the liquor business.[2]  While the law permits some overlap (e.g., grocery stores can sell malt beverages; liquor stores can sell some staple groceries),[3] it does not permit a "grocery store" to become a "package liquor store" by selling wine and distilled spirits, and vice-versa.

[Dkt. 44 pp. 22-23].

Again, this "choice" argument is a non-starter.  The question of whether a law violates equal protection does not turn on whether a person "chooses" to be part of an arbitrary class, or can "decide" to remove himself from that arbitrary class.  Instead, the analysis turns on whether there is a rational basis for discriminating between similarly situated individuals, even if the distinguishing feature is a matter of that person's choice.

---

[2] One might also say "drug stores are in the drug business."  Party Source chooses to overlook that analogy.  In fact, in today's world, "liquor stores," "drug stores," and "grocery stores" are in many businesses.

[3] There is no reciprocal "overlap" as Party Source suggests.  While Party Source is allowed to sell "some" staple groceries, grocery stores are not allowed to sell "some" wine and liquor.  It is a one-way street running entirely in Party Source's favor.

And here, there is no denying that Coalition members are similarly situated to retailers such as CVS, Walgreens, and Rite-Aid, all of whom have "chosen" to sell staple groceries, wine, and liquor in the front of their stores, but simply derive more revenue from prescription drugs sold at the back of their stores. Therefore, the question is whether there is a rational basis for denying retailers whose revenues primarily come from the sale of "staple groceries" and/or "gasoline" the ability to apply for and obtain one of the limited number of licenses to sell wine and liquor. The answer is no. It is arbitrary discrimination that should be abolished.

### 6.   KRS 241.060(1) Does Not Defeat Plaintiffs' Void for Vagueness Argument.

It is bedrock Kentucky constitutional law that the legislature may not pass a vague statute and then leave it to the executive branch to define the statute's terms. The legislature must define a statute's terms, or at the very least provide guidelines to the executive agency charged with fleshing out its terms. A law failing to do so is void for vagueness:

> If the legislature empowers the executive branch with authority to implement a statute without sufficient guidelines, it effectively delegates lawmaking to the executive branch. Without guidelines contained in the statute, itself, the executive branch must guess at the intent of the legislature and is thereby transformed from implementer of the law into maker of the law.

*Bd. of Trustees of the Judicial Form Retirement System v. Attorney General*, 132 S.W.3d 770, 781 (Ky. 2003). Accordingly, in this case, for KRS 243.230(5) to survive, the legislature must have either defined all of its terms or, at the very least, provided guidelines to the ABC Board for defining the terms "substantial part," "of the commercial transaction," and "staple groceries." It did neither of these things, and KRS 243.230(5) is therefore void for vagueness.

Party Source, however, contends that "KRS 241.060(1) provides the [ABC] board with the authority to promulgate 804 KAR 4:270," which is the regulation the ABC Board adopted to "eliminate the confusion that an absence of such definitions [in KRS 243.230(5)] has caused."

Party Source is wrong again.  First, KRS 241.060(1) does not delegate the authority to define statutory terms to the ABC Board.  Instead, the statute simply allows the ABC Board to "***promulgate reasonable administrative regulations governing procedures*** relative to the applications for and revocation of licenses, the supervision and control of the use, manufacture, sale, transportation, storage, advertising, and transportation, storage, advertising, and trafficking of alcoholic beverages, and all other matters over which the board has jurisdiction."  KRS 241.060.  The regulation at issue, 804 KAR 4:270, does not govern any "procedure," but instead defines vague ***substantive*** statutory terms.

Nevertheless, even if KRS 241.060(1) provides the ABC Board with the power to define the terms in KRS 243.230(5), that delegation fails because it does not include any guidelines or standards for defining the vague statutory terms.  *Judicial Form*, 132 S.W.3d at 781.  The fact that the legislature explicitly tells an executive agency "you can define a vague statutory term" – which the legislature did ***not*** do in KRS 241.060 – is not enough.  That delegation must be accompanied by standards or directions, and cannot leave the ultimate policy decision up to the executive branch.

For instance, in *Diemer v. Commonwealth*, 786 S.W.2d 861 (Ky. 1990), at issue was the constitutionality of KRS 177.814(2), a provision of Kentucky's Billboard Act that prohibited billboards from being erected on certain tracts of land outside of an "urban area."  The legislature specifically delegated the power to define the term "urban area" to the Secretary of Transportation.  The legislature even directed the Secretary of Transportation that his definition could not be "at variance" with the federal definition:

> "Urban areas" means those areas which the secretary of transportation, in the exercise of his sound discretion and upon consideration being given to the population within boundaries of an area and to the traveling public, determines by official order to be urban; provided, however, that any such determination or

designation of the secretary shall not, in any way, be at variance with the federal law or regulation thereunder or jeopardize the allotment or qualification for federal aid funds of the Commonwealth of Kentucky.

KRS 177.830(10) (invalidated by *Diemer*).

The Secretary of Transportation thereafter enacted a regulation defining "urban area" in exactly the same manner that the Federal Government defined that term. The Kentucky Supreme Court nevertheless struck down the law banning billboards outside of "urban areas" as void for vagueness, finding that the legislature failed to provide the Secretary of Transportation with sufficient "guidelines" for defining the vague statutory term:

> But perhaps [the regulation's] most serious defect is not in what it says, but in the fact that the Kentucky Secretary of Transportation has "broad discretion" granted by KRS 177.841(2) to use any definition he might choose as long as it is not at variance with the federal definition. The definition of what is an "urban area" (and thus what is not) may be as restrictive as the Secretary shall decide to make it. . . . With respect to KRS 177.814(2) the General Assembly has abdicated its legislative power by causing the entire prohibitive power of the statute to be dependent upon the "sound discretion" of the Secretary of Transportation, by delegating its authority to define the phrase "urban area."

*Diemer*, 786 S.W.2d 865-866.

Therefore, in *Diemer*, the legislature at least tried to provide some guidance to the Secretary of Transportation as to how to define "urban area." But its guidance was not enough, as it left too much discretion to the Secretary of Transportation and thereby enabled him to make a policy decision. The situation here is much worse. KRS 241.060(1) does not provide the ABC Board with any specific authority, much less any guidance, for defining the vague terms of KRS 243.230(5). Accordingly, "the entire prohibitive power of the statute" is dependent upon the definitions given to the vague terms by the ABC Board, and those definitions thereby constitute ***policy decisions*** by the executive instead of the legislature. Accordingly, KRS 243.230(5) and 804 KAR 4:270 violate Kentucky's strong separation of powers in exactly the same manner that the laws at issue in *Diemer* violated the separation of powers, and should be declared void for

vagueness.   Contrary to Party Source's suggestion, Kentucky's separation of powers doctrine applies just as forcefully to the ABC Act as it does to any other act.   The mere fact that the ABC Act concerns alcohol does not provide Kentucky's executive branch with legislative powers.

> ### 7.    This Court Can Engage In Judicial Review.

Party Source continues to argue that this Court does not have the power to strike down KRS 243.230(5), claiming that the exercise of judicial review of a statute's constitutionality violates the separation of powers [Dkt. 44 pp. 27-28].   There is no need to reply to this argument. Suffice it to say, when a defendant seeking to protect a law resorts to attacking the constitutionality of judicial review, the law at issue is probably unconstitutional.

> ### 8.    The Goal of Stopping Drunk Driving Provides No Rational Basis For Excluding Sellers of Gasoline From the Sale of Wine and Liquor.

Party Source's expert Pamela S. Erickson posits that is reasonable for states to prohibit convenience stores who sell gasoline from selling wine and liquor because the presence of gasoline means that some customers will arrive and leave in automobiles, and preventing those shoppers from purchasing wine or liquor will deter drunk driving:

> It is also highly reasonable to prohibit convenience stores that sell gas and lubricating oil from selling wine and spirits.  As discussed in my Expert Report, several states have regulations about gas stations due to the serious problem of drinking and driving.  This prohibition acts as a means to limit availability and to act as a deterrent to drunk driving.

[Dkt. 44-1 ¶ 16].

Notably, Party Source does not rely on this rationale in any of its briefs to date (nor does the State), and it is pretty easy to understand why.  Party Source probably took one look outside its front door at its 240-space parking lot (which is larger than a football field), or saw its website page that provides customers with "***driving*** directions," and decided that it would look silly if it argued that it is reasonable to ban stores from selling wine and liquor because their customers

come and leave via automobile [*see* Ex. Y, picture of Party Source's parking lot and "Driving Directions" obtained from Party Source's Website].

It is undeniable that the vast majority of customers purchasing alcohol ***anywhere*** – whether at Party Source or at a convenience store – will ultimately drive away with it.  In fact, numerous traditional "package stores" in Kentucky have ***drive through windows*** at which drivers can purchase wine and liquor from their running car without even having to get out [*See*, *e.g.*, Exhibit Z, photo of "Old Town Liquors" Drive-Through on Bardstown Road in Louisville]. Accordingly, it makes no sense to exclude convenience stores from the wine and liquor market simply because some of their wine and liquor patrons will arrive and leave in an automobile. Party Source avoided this groundless contention in prior briefing, and to the extent it tries to rely upon it in its final reply brief, the contention must be rejected.

## CONCLUSION

There is no rational basis, nor any substantial and reasonable justification, for excluding retailers who sell "substantial" amounts of "staple groceries" and/or gasoline from the universe of retailers who can apply for and receive one of the limited number of wine and liquor licenses available in Kentucky.  Moreover, the statute that embodies this discrimination, KRS 243.230(5), is void for vagueness.  Accordingly, Plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,

s/  Christopher W. Brooker
M. Stephen Pitt
Christopher W. Brooker
WYATT, TARRANT & COMBS, LLP
500 W. Jefferson Street, Suite 2800
Louisville, Kentucky  40202
502.589.5235
***Counsel for Plaintiffs***

15

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on this 16th day of February, 2012, a copy of the foregoing was served electronically via the CM/ECF filing system upon the following:

Peter F. Ervin, Esq.

General Counsel

Public Protection Cabinet

Capital Plaza Tower

500 Mero Street

5th Floor

Frankfort, Kentucky  40601

Kenneth S. Handmaker, Esq.

Kevin L. Chlarson, Esq.

Loren Prizant, Esq.

Middleton Reutlinger

2500 Brown & Williamson Tower

Louisville, Kentucky  40202

<u>s/ Christopher W. Brooker</u>

One of Counsel for Plaintiffs

60125492.1