UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:11-CV-18-H

MAXWELL'S PIC-PAC, INC., et. al.

PLAINTIFFS

v.

TONY DEHNER, et. al.                                                    DEFENDANTS

**MEMORANDUM OPINION**

Kentucky, like all states, extensively regulates the sale of alcoholic beverages within its

borders.  As part of this alcohol control scheme, Ky. Rev. Stat. § 243.230(5) and its

accompanying regulation, 804 Ky. Admin. Regs. 4:270 (1982) (hereinafter sometimes referred to

collectively as the "Statute"), bar grocery stores and convenience store operators, such as

members of the Food With Wine Coalition (the "FWWC") and Maxwell's Pic-Pac (collectively,

"Plaintiffs"), from obtaining a license to sell package liquor and wine, while permitting

drugstores and others to do so.  Plaintiffs argue that this differential treatment violates the equal

protection provisions of the United States and Kentucky Constitutions and that the Statute also

violates the separation of powers provisions of the Kentucky Constitution.

Tony Dehner and Danny Reed, the named defendants from the Kentucky Department of

Alcohol and Beverage Control (the "State"), argue the Statute is a permissible exercise of

Kentucky's broad police powers to regulate liquor sales.  Intervening Defendant, Liquor Outlet,

LLC, d/b/a The Party Source ("Intervening Defendant" or "Party Source") has been licensed as a

retail package liquor business since 1993 and also sells staple groceries.  Both sides have moved

for summary judgment.  They agree that no material facts are contested and that the dispute can

be resolved as a matter of law.

The issues raised here are matters of considerable consequence to package liquor stores, grocers, convenience stores, gas stations, drugstores and others who are either permitted or restricted from doing business under the current package liquor regulatory scheme.  The reason is that accepting Plaintiffs' arguments would cause dismantling of an important part of the regulatory scheme that has been in place for over seventy years.  Mindful of this, the Court has determined to set forth a careful and comprehensive review and analysis of the relevant issues.

I.

Before addressing the substance of Plaintiffs' claims, it is instructive to review the history of alcohol control laws in Kentucky and describe the current statutory and regulatory framework.

For most of the nineteenth century, "the natural status of the situation . . . was tha[t] anybody had the right to sell liquors anywhere, to anybody, and at any time."  *Bd. of Trs. of Town of New Castle v. Scott*, 101 S.W. 944, 948 (Ky. 1907).   By the time of Kentucky's constitutional convention in 1891, liquor traffic was "regarded as one of the most serious evils of the age."  *Id.*  The new state constitution allowed individual counties and smaller localities to regulate, or completely ban, sales of "spiritous, vinous, or malt liquors through the procedure of local option elections."  Ky. Const. § 61.

Soon after ratification of the Eighteenth Amendment to United States Constitution in 1919, Kentucky amended its own constitution to prohibit the manufacture, sale, or transportation of intoxicating liquors, implicitly repealing § 61.  Ky. Const. § 226a.  Three years later, the Kentucky General Assembly passed the Rash-Gullion Act, an enforcement statute for § 226a.

2

Carroll's 1933 Statutes Annotated, § 2554a-1 to a-47.[1]

A decade's experience with Prohibition under the Rash-Gullion Act and its federal counterpart, the Volstead Act, left the state "infested with bootleggers . . . corruption and crime, no revenue, no control, disrespect for law and general demoralization."  Ky. Liquor Control Comm., *Report of the Liquor Control Comm.* 3-4 (1933).  The bootleggers' only competition was "the combination of the easy doctor and the easy druggist," as a retail sale could be made upon a physician's prescription.  *Id.* at 4-5.  No doubt in light of this experience, Kentuckians voted to ratify the Twenty-first Amendment in November 1933.  *Id.* at 4.

The December 5, 1933 ratification of the Twenty-first Amendment repealed the Eighteenth Amendment and marked the end of Prohibition.  But it left Kentucky in a temporary bind.  The Kentucky Constitution still prohibited alcohol traffic and sales, and circumstances made it impossible to submit an amendment of § 226a for a vote of the people until the November 1935 election.  Forrest Revere Black, *Is an Immediate Liquor Program for Kentucky Within the Scope of Constitutional Possibilities?*, 22 Ky. L.J. 191, 192 (1933-1934).  To find a temporary fix, Governor Ruby Laffoon appointed a committee to recommend legislation for the interim period before § 226a could be repealed.

The Governor's committee drafted two proposed bills – one supported by the majority of

---

[1] The Kentucky legislature changed the numbering system to its present form, as reflected in the Kentucky Revised Statutes, in 1942.  Hereinafter, citations to pre-1942 statutes will take the form of "Ky. Stat." followed by the section number.  All such citations are to Carroll's 1936 Kentucky Statutes Annotated, unless otherwise noted. Citations to post-1942 statutes are to Michie's Kentucky Revised Statutes, unless otherwise noted.

the committee,[2] the other a minority bill.[3] The Kentucky General Assembly adopted neither in whole. Instead, it enacted the Kentucky Alcohol Control Act of 1934, which repealed the Rash-Gullion Act and provided for permits and taxes for limited package and on-premise, by-the-drink alcohol sales. It required that all such sales, at least ostensibly, be for medicinal purposes but did not require a prescription. *See*, Ky. Stat. § 2554b-17 and b-18; § 2554b-27. The Act did not restrict the types of premises that could hold a "retailer's permit" for package sales.[4] Ky. Stat. § 2554b-16.

In November 1935, Kentucky voters approved a repeal of § 226a and reenacted § 61, the local option election provision that § 226a had implicitly repealed. Ky Const. § 61 (LexisNexis 2002) Compiler's Notes. Three years later, the General Assembly enacted the Alcohol Beverage Control Law, 1938 Ky. Acts 48, which repealed the 1934 Kentucky Alcohol Control Act and established the basic statutory framework that exists today.[5] It included the first iteration of the present-day § 243.230(5), which provided:

> "No Retailer Package License or Retail Drink License shall be issued for any premises used as or in connection with the operation of a grocery store or filling

---

[2] The majority's bill would have allowed hotels, restaurants, and clubs to sell liquor for on-premise consumption under certain conditions. It also proposed a license tax for package sales made in connection with another established business. Any person selling liquor not in connection with another established business would be guilty of a misdemeanor and subject to fines. *Report of the Liquor Control Comm.* 19-20.

[3] The minority's bill would have licensed sales of beer and wine with low alcohol contents only in grocery stores and drugstores, while restricting liquor distribution to "mechanical, scientific, sacramental or medicinal purposes." *Report of the Liquor Control Comm.* 43-44.

[4] Distillers, rectifiers and wholesalers could not hold a retailer's permit.

[5] Eventually, about 90 of Kentucky's 120 counties outlawed the sale and consumption of alcoholic beverages by county local option. The historic prohibition of alcoholic consumption throughout the state survived and thrived for decades through a conspiracy of convenience among ministers and bootleggers, each of whom had their own reasons for supporting the status quo. *See* John Ed Pearce, *Divide and Dissent: Kentucky Politics, 1930-1963* (1987).

4

> station.  "Grocery Store" shall be construed to mean any business enterprise in
> which a substantial part of the commercial transaction consists of selling at retail
> products commonly classified as staple groceries.  "Filling Station" shall be
> construed to mean any business enterprise in which a substantial part of the
> commercial transactions consists of selling gasoline and lubricating oil at retail."

*Id.* at 102.  The existing legislative records contain no hint whatsoever of the rationale behind the

Statute's classification.  Perhaps the General Assembly sought to extend the status quo under

which drugstores had sold alcohol ostensibly only for medicinal purposes throughout

Prohibition.  We do not know.  In any event, the Statute today contains the same basic

provisions.[6]  In its current form, the Statute reads:

> "No retail package or drink license for the sale of distilled spirits or wine shall be
> issued for any premises used as or in connection with the operation of any
> business in which a substantial part of the commercial transaction consists of
> selling at retail staple groceries or gasoline and lubricating oil."

Ky. Rev. Stat. Ann. § 243.230(5) (LexisNexis 2005).

Nearly fifty years after the Alcohol Beverage Control Law's enactment, the Alcohol

Beverage Control Board, pursuant to its powers under Ky. Rev. Stat. § 241.060(1), promulgated

a regulation to address confusion caused by an absence of definitions for "staple groceries" and

for "substantial part of the commercial transaction" in § 243.230(5).  Historical Notes to 804 Ky.

Admin. Regs. 4:270 (1982).  The regulation provides:

> "Section 1. For the purpose of enforcing KRS 243.230(5) "substantial part of the
> commercial transaction" shall mean ten (10) percent or greater of the gross sales
> receipts as determined on a monthly basis.
>
> Section 2. For the purpose of enforcing KRS 243.230(5) staple groceries shall be

---

[6] The format and numbering have changed more than the actual text.  The Kentucky Revised Statutes
organized the Alcohol Beverage Control Law into Chapters 241, 242, 243 and 244, covering Administration
and Control, Local Option, Licenses and Taxes, and Prohibitions, Restrictions and Regulations, respectively.  The
current language of § 243.230(5) appears in the 1942 version at § 243.230(4).  The language has not changed since
then – only the subsection was renumbered from (4) to (5) in 1972.  1972 Ky. Acts 422.

> defined as any food or food product intended for human consumption except
> alcoholic beverages, tobacco, soft drinks, candy, hot foods and food products
> prepared for immediate consumption."

804 Ky. Admin. Regs. 4:270.  The regulation was promulgated as originally proposed, with the

exception of adding "candy" to the list of items excluded from the "staple groceries" definition

after a public hearing.

## II.

The Intervening Defendant makes several preliminary arguments which would deny

Plaintiffs the ability to pursue their substantive challenges to the Statute.  It argues that

Plaintiffs' claims fail on the two threshold grounds of standing and a statute of limitations.  The

Court will discuss each in turn.

## A.

The Intervening Defendant argues that neither Maxwell's Pic-Pac nor FWWC are proper

parties to challenge the Statute because they fail to meet Article III's case-or-controversy

requirements.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiffs must

establish three elements to have standing: (1) a concrete and particularized injury in fact; (2) a

causal connection between the injury and the defendant's conduct; and (3) a likelihood that a

favorable decision of this Court would redress the injury.  *Blachy v. Butcher*, 221 F.3d 896, 909

(6th Cir. 2000).  Furthermore, when an organization, such as the FWWC, brings a suit on behalf

of its members, it must demonstrate that "(a) its members would otherwise have standing to sue

in their own right; (b) the interests it seeks to protect are germane to the organization's purpose;

and (c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Though it appears quite obvious that Maxwell's Pic-Pac and other FWWC members have suffered economic injuries because the Statute makes them ineligible for retail package licenses, the Intervening Defendant argues to the contrary.  First, it argues that grocery stores are not prohibited from selling wine and liquor – they need only do so in separate premises.  True, grocery stores may obtain a retail package license for a separate adjacent premise, and some have done so.  This does not negate the underlying injury, however.  To the contrary, it demonstrates the financial burdens a grocery store must undertake to sell wine and liquor.

Second, the Intervening Defendant argues that Maxwell's Pic-Pac cannot show injury in fact because it knew about the Statute when it opened for business.  Consequently, it could not have expected to sell wine or liquor and is not injured in fact.  Defendants cite no authority for this proposition.  Whether Maxwell's Pic-Pac knew about the Statute when it opened for business or not, the Court concludes that its ineligibility for a wine and liquor license is still a concrete injury.

The Intervening Defendant also argues that a favorable decision from this Court would not redress the alleged injury because it would not guarantee Plaintiffs licenses to sell liquor and wine.  Though this premise is surely correct, the conclusion drawn from it mistakes the nature of the alleged injury.  The harm Plaintiffs suffer is not that some retailers have licenses while they do not; it is that Plaintiffs cannot apply for licenses on the same footing as other retailers.  Finding the Statute unconstitutional would certainly redress that harm.

Finally, Intervening Defendant also attacks FWWC's associational standing, arguing that the interest at stake here is not germane to FWWC's purpose.  However, three FWWC members own gas stations along with their grocery stores.  Likewise, FWWC's focus on wine sales does

7

not defeat their standing to challenge the Statute.  Kentucky licenses wine and liquor sales through a single "retail package license," for which Plaintiffs are currently ineligible by the Statute.  Whether FWWC's members would ultimately sell wine only, as opposed to wine and liquor, does not deprive persons ineligible for that license of standing merely because they do not plan to sell both products.

B.

Plaintiffs' federal constitutional claims under 42 U.S.C. § 1983 are subject to the state law statute of limitations for personal-injury torts.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citations omitted).  In Kentucky, the one-year statute of limitations found in Ky. Rev. Stat. § 413.140(1)(a) governs.  *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990).  Such claims accrue "when the plaintiff knows or has reason to know of the injury which is the basis of [the] action."  *Dixon v. Clem*, 492 F.3d 665, 671 (6th Cir. 2007) (citations omitted).  But "[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations."  *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) (internal quotation marks omitted).

The Intervening Defendant argues that the FWWC's claims accrued when the organization formed in July 2007, more than three years before filing this lawsuit, because the FWWC knew of the statutory prohibition of grocery stores receiving retail package licenses.  Although the FWWC's alleged constitutional injury may have began in 2007, the Statute clearly works an on-going, continued harm, such that "a new injury was inflicted on [P]laintiffs each day."  *See id.* (quoting *Baker v. F & F Inv. Co.*, 489 F.2d 829, 836 (7th Cir.1973)).  Like the county's resolution banning trucks in through-traffic on certain roads in *Kuhnle*, § 243.230(5)'s

8

ban on grocery stores and gas stations receiving licenses continued past the date it was enacted, the injury continued to accrue, and further injury could have been avoided had Kentucky repealed the statute. *Id.* Also as in *Kuhnle*, Plaintiffs are not "merely suffering additional harm from a prior unconstitutional act." *Id.* Thus, FWWC suffered injury within one year of filing suit and the statute of limitations is satisfied.[7]

III.

Plaintiffs' central argument is that § 243.230(5) and 804 KAR 4:270 violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (U.S. 1985). The guarantee of equal protection does not require a statute to apply equally to all persons – it may "impose special burdens upon defined classes in order to achieve permissible ends." *Rinaldi v. Yeager*, 384 U.S. 305, 309 (1966).

We are most familiar with the application of the Equal Protection Clause to our inherent individual rights to equal treatment regardless of race, creed, gender, alienage and the like. It may seem quite odd that the same ennobled constitutional protection might also somehow apply to grocery stores and gas stations. And, of course, it does not exactly. The Equal Protection

---

[7] Party Source attempts to distinguish *Kuhnle*, arguing that the statute of limitations did not apply because the alleged injury was a deprivation of a liberty interest – the freedom to travel – rather than a property interest. Although the *Kuhnle* court applied the statute of limitations to bar a claim based on violation of a property interest rather than a claim implicating a liberty interest, the property/liberty distinction was not the basis for the different outcomes. Instead, the court explained that where a county resolution worked a "taking" of a person's property interest, the injury was complete upon passing of the resolution. *Kuhnle*, 103 F.3d at 521. As explained above, where the resolution (or here, a state statute) deprived a person of asserted constitutional rights each day it was in effect, the statute of limitations does not preclude a constitutional challenge. The key to the analysis is whether the injury was on-going rather than completed outside of the limitations period, not whether the plaintiff suffered an injury to a liberty interest rather than a property interest.

9

Clause applies quite differently in these circumstances.

A.

When reviewing a statutory classification of persons along suspect categories, such as race or alienage, courts apply the so-called strict scrutiny standard. *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 618, 621 (6th Cir. 1997).  In those circumstances, one starts from a presumption that such a classification is invalid.  On the other hand, so-called quasi-suspect classifications, such as those based on gender or illegitimacy, demand a "somewhat less stringent evaluative norm" that is "sometimes called 'intermediate scrutiny.'"  *Id.* at 621.  None of these classifications are involved here.

Here, the Statute regulates in the arena of social and economic policy.  Consequently, a much lower standard known as "rational review" or the "rational basis test," applies.  *E.g. U.S. v. Green*, 654 F.3d, 637, 651 (6th Cir. 2011); *Seger v. Ky. High School Athletic Ass'n*, 453 F. App'x 630, 634 (6th Cir. 2011).  The Court presumes the Statute's validity and must "uphold the legislative classification so long as it bears a rational relation to some legitimate end."  *Romer v. Evans*, 517 U.S. 620, 631 (1996).  It must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 305, 313-14 (1993).  Moreover, the wisdom of the Kentucky legislature's decision is not at issue.  *Id.* at 314-15.  The statutory classification can be based on speculation as to a reasonably conceivable state of facts, so long as that speculation is rational.  *Id.* 314-15.  Finally, the challenging party bears the burden "to negative every conceivable basis which might support" the legislative classification.  *Id.* at 315 (internal quotation marks and citation omitted).  This standard is intended to be quite deferential to legislative prerogatives.

10

The jurisprudence of the Equal Protection Clause has a dynamic history, evolving from "the usual last resort of constitutional arguments" to "the [Supreme] Court's chief instrument for invalidating state laws. *Zablocki v. Redhail*, 434 U.S. 374, 395 (1978) (Stewart, J., concurring) (quoting *Buck v. Bell*, 274 U.S. 200, 208 (1927)).  Kentucky's Alcohol Beverage Control Law came soon after *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), marked the end of the *Lochner* era of significant judicial intervention in economic regulation under the guise of the Fourteenth Amendment's Due Process Clause.[8]  The judicial posture towards legislation in the economic realm shifted to restraint and deference in the New Deal era.  *See Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) (describing a return to "the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies" after the *Lochner* era). This deferential posture took root in the Fourteenth Amendment's Equal Protection Clause as well, as exemplified by the rational review applied in *Williamson v. Lee Optical of Okla.*, 348 U.S. 483 (1955).

However, the deferential posture has never meant that judges abdicate their proper role. *See Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998) ("rational basis review, while deferential, is not toothless").  Courts must always ensure that some rational link exists between a statute's classification and objective.  *Romer*, 517 U.S. at 632.  Thus, modern application of rational review upholds the long-established principal of judicial restraint and deference to legislative determinations, *see Beach Commc'ns*, 508 U.S. at 314, but also guards against government action that is arbitrary or lacks any legitimate purpose.  *See Cleburne*, 473

---

[8] The Alcohol Beverage Control Law also came the same year Justice Stone wrote his famous "footnote four" in *U.S. v. Carolene Prods. Co.*, which supported later decisions applying heightened scrutiny of laws disadvantaging "discreet and insular minorities."  304 U.S. 144, 152 n.4 (1938).

U.S. at 446.

B.

Given this appropriately deferential standard of review and the many permissible reasons for states to regulate the sale of intoxicating liquors, most state alcohol control statute classifications have withstood equal protection challenges.  A thorough review of these federal and state cases reveals some helpful analysis, but nothing directly applicable or controlling here.

In *Ohio Liquor Control*, the Sixth Circuit upheld a statute's differential treatment of holders of different types of retail alcohol licenses.  113 F.3d at 623.  Ohio's alcohol control scheme employed ten classes of licenses, divided mainly by the type of alcohol licensed and how it may be manufactured, transported, sold and consumed.  *Id.* at 617.  The plaintiff, a tavern-owner, challenged a provision that allowed local communities the option by referenda to prohibit retail beer sales.  But breweries were not subject to a local option referendum – they could sell beer despite a local option vote that would ban beer sales in package stores and bars.  *Id.* at 621. The Sixth Circuit concluded, however, that this classification reflected a legislative judgment that the sale of beer at breweries did not pose the same risks of fights, automobile accidents, and crime, that sales in package stores and bars presented.  *Id.* at 621.  The classification also advanced a policy of promoting and protecting investment in costly brewery facilities and in-state production of beer.  *Id.*

The Ohio statute is conceptually quite different from Kentucky's legislative classification.  It treats retailers differently based on the nature of how they sold alcohol, whereas the Statute treats retailers differently based on the extent of their sales of groceries and gas.  As such, *Ohio Liquor Control* does not provide much guidance here.

12

More recently, the Eleventh Circuit upheld an ordinance banning persons under the age of twenty-one from entering an establishment authorized to sell alcohol. *Gary v. City of Warner Robins*, 311 F.3d 1334 (11th Cir. 2002). But the ban exempted alcohol-selling establishments deriving at least two-thirds of their total annual gross food and beverage sales from prepared meals or food. *Id.* at 1336. The court held that the City had a legitimate interest in curbing underage drinking and that the City rationally believed the risk of underage drinking to be greater in bars than in restaurants. *Id.* at 1339. Because this ordinance focused on the underage patrons of those already licensed to serve alcohol, the court's analysis is not directly relevant here.

Defendants cite *Simms v. Farris*, 657 F. Supp. 119, 124 (E.D. Ky. 1987), for the proposition that the need to regulate the sale of alcoholic beverages is a sufficient rational basis for the Statute. However, the Court sees that *Simms* is not very relevant to our case. First, the statute at issue in *Simms,* § 243.230(4), set conditions on package liquor licenses for premises not located in a city. The differential treatment of grocery stores and gas stations in § 243.230(5) was neither challenged nor discussed. Second, the opinion is devoted almost entirely to the plaintiffs' argument that § 243.230 gave existing licensees a monopoly, violating federal antitrust statutes. Without any analysis of the equal protection claim, the opinion merely states conclusively that the "plaintiffs' substantive due process and equal protection attacks fail" because the statute in question was "a valid exercise of the Commonwealth's Twenty-first Amendment power." *Simms*, 657 F. Supp. at 124. *Simms* at heart was an antitrust case and, as such, does not inform this Court's equal protection analysis.

Other examples of alcohol control measures that withstood rational review include: an

ordinance forcing bars to close at 2:00 a.m., but not alcohol-serving hotels, *Denene, Inc. v. City of Charleston*, 596 S.E.2d 917, 921 (S.C. 2004); a statutory scheme banning Sunday alcohol sales in bars, but giving local governments the option to allow such sales in restaurants, *State v. Heretic, Inc.*, 588 S.E.2d 224, 225 (Ga. 2003); a statute requiring a distance of 600 feet between bars in one area of a city, but not in another area, *Consolidated Gov't of Columbus v. Barwick*, 549 S.E.2d 73, 75-6 (Ga. 2001); and a ban on chain-store businesses and franchises from holding liquor licenses, *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 16 (1st Cir. 2007). The courts in these cases found some rational relationship existed between the classification drawn by the statute and legitimate government interests.

Some courts have found that alcohol control statutes lacked a rational basis.[9]  The Nebraska Supreme Court struck down several provisions of an alcohol control scheme on equal protection grounds.  *See Hy-Vee Food Stores v. Neb. Liquor Control Comm'n*, 497 N.W.2d 647, 652-53 (Neb. 1993) (requirement that alcohol sales be "separate and distinct" from other business only applied to dual business operators selling liquor for off-premise consumption); *Gas 'N Shop, Inc. v. Neb. Liquor Control Comm'n*, 427 N.W.2d 784, 790-91 (Neb. 1988) ("separate and distinct" requirement not applied to bowling alleys, hotels, motels, clubs, or restaurants); *Casey's Gen. Stores v. Neb. Liquor Control Comm'n*, 369 N.W.2d 85, 88 (Neb. 1985) (prohibition on acquiring more than two liquor licenses exempted hotels, bowling alleys, city-owned facilities, and restaurants).  The court saw no rationality in, for example, "treating a

---

[9] Courts have also struck down alcohol control statutes that contained sex-based classifications.  For example, in *Commonwealth of Ky. ABC Bd. v. Burke*, 481 S.W.2d 52 (Ky. 1972), the Kentucky Supreme Court struck down a provision of the Alcohol Beverage Control Act that prohibited women from being bartenders and from drinking liquor at a bar.  The sex-based classification at issue distinguishes *Burke* from this case, as such classifications warrant more searching judicial review than is appropriate here.

chain restaurant, such as Pizza Hut, any differently from a chain of convenience stores" as to alcohol retail licenses.  *Casey's Gen. Stores*, 369 N.W.2d at 88; *see also*, *Castlewood Int'l Corp. v. Wynne*, 294 So.2d 321, 324 (Fla. 1974) (striking down statute requiring vendors of beer and wine, but not liquor, to make all purchases in cash, as the classification between types of alcohol sold bore no rational relation to state interests).

These cases demonstrate that not every statute will meet even the rational basis test. They show that when an alcohol control statute makes a classification based on how businesses sell alcohol, the statute will generally satisfy rational review.  But classifications among potential alcohol vendors seemingly without a rational link to a conceivable legislative purpose are subject to meaningful judicial review.

IV.

The Court now arrives at its most important and daunting task – to identify and analyze the legitimate government interests which might support the Statute's separate classification of grocers and gas stations from all other retailers.  The Court need not attempt to read the legislative mind.  "It is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature," *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. at 314-315.  Nor does the State even have an obligation to articulate a particular purpose or rationale for the Statute.  This presents the Court with the difficult task of considering all possible rationales for the Statute and then also determining whether any of them are at least conceivable as the enacting legislature's motivation.

Fortunately, the State has suggested a few of the most likely interests at work:  (1) stricter regulation of more potent alcoholic beverages; (2) curbing potential abuse by limiting access to

15

the products; (3) keeping pricing among merchants competitive, but not so low as to promote

excessive consumption; (4) limiting the potential for underage access; (5) limiting alcohol sales

to premises where personal observation of the purchase occurs; and (6) balancing the availability

of a controversial product between those who want to purchase it and those who seek to ban it.

The Court can imagine no other interests at work.[10]

Admittedly, it is a difficult judicial task to imagine reasons for a legislative classification

based upon mere conceivability or even speculation.  As a judge, one must apply a sort of "ante-

logic" to such a task.  Bearing all of the foregoing in mind, the Court will discuss these potential

interests in the subsections that follow.

A.

First, a few comments about what the Statute does not address.

The State does not contend that the Statute addresses an inherent problem with selling

wine and liquor alongside staple groceries.  Nor does it appear that such a problem exists.

Consumers routinely purchase these products together from businesses that primarily sell

alcoholic beverages, such as Party Source, and from businesses that primarily sell other goods,

such as CVS.  This sets the Statute apart from the legislation at issue in *Ohio Liquor Control*,

which treated breweries differently than bars and package stores to advance a legitimate interest

in promoting investment in costly brewery operations.  113 F.3d at 621.  As noted above, when a

classification and legitimate interest do concern the same subject matter, as in *Ohio Liquor*

*Control* (breweries) and *City of Warner Robins* (underage drinking), the classification within the

---

[10] Protecting businesses that currently sell liquor and wine from economic competition is not a legitimate governmental purpose.  *See Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002).

legislation almost certainly will pass rational review.  Here, that is not the case.

The classification also does not appear to have any relationship to the nature of grocers' business as compared to other retailers, like drugstores.  For example, there are large and small grocers and drugstores.  There are chain grocers and drugstores; there are "mom-and-pop" grocers and drugstores.  They sell many of the same products, although in different proportions. The nature of the transactions occurring in each are as diverse as one can imagine.

Nevertheless, the State claims that withholding liquor licenses from grocery stores and gas stations has some effect on each of the purposes it proffered.  The truth of this assertion is not for the Court to question, so long as it was conceivable that the Kentucky legislature could have believed it.  *See Beach Commc'ns*, 508 U.S. at 313-314.  However, an entirely arbitrary classification may have a demonstrable effect on a legitimate government interest, yet still be unconstitutional because the classification-to-interest relationship is irrational.  *See Craigmiles v. Giles*, 312 F.3d 220, 226 (6th Cir. 2002) (noting that a classification could have an effect on public health and safety, yet still deny equal protection because it lacked a rational relationship to that effect).  Thus, the Court must search for not merely any relationship, but a rational one.

### B.

Several of the specific proffered government interests are easily resolved.  The Court will address these now.

First, the State undoubtedly views the consumption of wine and liquor as potentially more dangerous than beer because of their higher potencies.  Relatedly, the State might want to limit accessibility to the general public to avoid abuse of these products.  These interests certainly justify tighter controls on the sale of these products, such as capping the number of

retail package licenses for wine and liquor, but not beer.  *See* Ky. Rev. Stat. Ann. § 241.065; 804 Ky. Admin. Regs. 9:010.  However, it does not explain why a grocery-selling drugstore like Walgreens may sell wine and liquor, but a pharmaceutical-selling grocery store like Kroger cannot.  This distinction would seem to have no relationship whatsoever to the control of higher-proof alcohol sales or the abuse of these products.  The State has not explained that rational relationship, and the Court cannot think of one.

Second, the State suggests that the Statute somehow keeps pricing among alcohol merchants competitive, but not so low as to promote excessive alcohol consumption.  Kentucky has a legitimate interest in the pricing of alcohol sales and has directly regulated in that arena. *See, e.g.*, Ky. Rev. Stat. Ann. § 244.050 (prohibiting retail sales below cost).  This interest in pricing could potentially justify a ban on alcohol sales in chain-stores and franchises, *see Wine & Liquor*, 481 F.3d at 16, but that is not the classification that Kentucky has drawn.  Indeed, the licensing and taxing scheme detailed in Ky. Rev. Stat. Ch. 243 certainly has some impact on retail alcohol prices in Kentucky.  However, the State has not suggested even the vaguest reason how the price of alcoholic beverages would be any different, for instance, were the Statute's arbitrary prohibitions on sale simply reversed. The Court cannot conceive how the degree to which a business sells non-grocery items more than it sells grocery items bears on liquor and wine prices in any manner.

## C.

Next, the Court will discuss the state's acknowledged interest in limiting the accessibility

18

of wine and liquor to underage persons.[11]  In its briefing and at a non-evidentiary hearing, the State relied heavily upon this as the Statute's purpose.  While this is certainly a noble purpose, the State offers no reason why the degree to which a retailer sells groceries or gas is rationally related to curbing underage access to alcohol, nor can the Court identify one on its own.

Of course, reducing the number of wine and liquor retailers could also diminish underage access.  Kentucky is free to reduce the number of outlets for wine and liquor sales, as it does through its statutory quota system, *see* Ky. Rev. Stat. Ann. § 241.065, but may not do so in an arbitrary and discriminatory manner.  The Statute's classification regulates the type, not the number, of premises that can receive a license.  There must be a rational basis for excluding grocery stores from wine and liquor sales, but including other retailers.

The State argues that "[l]imiting the package sale of spirits and wine to liquor stores whose primary business is the sale of spirits and wine . . . is an increased control measure [that] is rationally related to controlling access to distilled spirits and beverages."  Def.'s Mot. Summ. J. 4.  True, limiting alcohol sales to stores that disallow underage persons on the premises would rationally relate to Kentucky's interest in reducing underage access to wine and liquor.  *See* Ky. Rev. Stat. Ann. § 244.085(8) (barring persons under the age of twenty-one from premises that sell packaged alcohol, unless "the usual and customary business of the establishment is a convenience store, grocery store, drugstore, or similar establishment").  And it would also limit the sale of package wine and liquor only in places where persons disposed to temperance would have no occasion to frequent.  *See infra* Part IV.D.

---

[11] As referenced in Part IV.B, *supra*, the State coupled this argument with the related but less convincing suggestion that the legislature simply intended to limit liquor and wine consumption by all ages.

The fallacy of this argument is that it completely mischaracterizes the Statute.  Quite simply, the Statute does not limit package sales of spirits and wine to stores whose primary business is the sale of those products.  Instead, it allows package liquor licenses to stores whose primary business is anything other than groceries or gas.  The primary business of stores like Walgreens and CVS is not spirits and wine, yet they are free to hold package liquor licenses.  Thus, the rational bases for limiting package liquor licenses to traditional package liquor stores are irrelevant here because the Statute does not make this classification.  They have no bearing whatsoever on treating gas and grocery retailers differently than all other retailers for the purpose of applying for package liquor licenses.

Finally, the Court must address the State's related argument that because some grocery stores now use "self-checkout" machines, they are a less-reliable guard against underage purchases of wine and liquor.  The State says that this is a conceivable basis for the classification.  Of course, the Statute does not contain a classification based on self-checkout machines, either directly or indirectly.  *See Craigmiles*, 312 F.3d at 227 (noting that, under rational review, a legislature's circuitous path to legitimate ends is suspicious when a direct path is available).  It must be conceded that only some chain grocery stores have such machines and few, if any,  convenience stores or gas stations use them.  Conversely, drugstores are free to install these machines and continue their liquor and wine sales.  Consequently, the Court can find no conceivable reason why grocery stores offer either more or less personal observation of customer purchases than any other types of stores.

Furthermore, there may be a conceptual obstacle to this argument.  Although the asserted rational basis need not have been the legislature's actual motivation, it must at least have been

20

conceivable or possible. *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992) (rational review "does require that a purpose may conceivably or 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker") (quoting *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528-29 (1959)).  Here, self-checkout machines were decades from invention in 1938, when the "relevant governmental decisionmaker," the Kentucky General Assembly, enacted the Statute.  The Court has found no case that addresses such an anomaly – that the purported rationale literally could not have existed.  However, if the Court's job is to review conceivable reasons for a statutory enactment, then this reason would simply fail *ab inititio*.

D.

Finally, the State contends that the Statute represents a legitimate compromise, balancing the availability of a controversial product between the interests of those who want to purchase it and those who seek its outright prohibition.  The State claims that "[g]rocery stores are community gathering centers frequented by all citizens, including those diametrically opposed on the subject of alcohol beverage sales."  Def. Dehner's Supplemental Resp. to Interrog. No. 3, p.4.  Purportedly, the Statute sought to limit direct conflict between those groups.  The Kentucky legislature could have conceived grocery stores as places where people both supporting and opposing alcohol sales might intermingle to purchase staple groceries.  Allowing grocery stores to sell beer, but not wine and liquor, could be viewed as striking a balance between these conflicting interests.[12]  This is the State's vaguest and yet, perhaps, its most persuasive rationale.

Kentucky's legislature was well within its broad powers to prohibit liquor sales in stores

---

[12] Notably, the State does not argue that gas stations or convenient-type stores are "community gathering centers."

21

that might serve as a gathering point in a community.  But it may not arbitrarily limit this prohibition to only certain community gathering centers while allowing liquor sales in others. To be sure, courts routinely uphold legislative line-drawing, but only where the legislative body must draw a line and can identify some rational basis for it.  *See Beach Commc'ns*, 508 U.S. at 315-16 (citing *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

For example, in *F.C.C. v. Beach Commc'ns*, the Supreme Court first noted that Congress "had to draw the line somewhere" to establish franchising requirements for cable systems.  The Court then identified two possible bases for Congress's drawing a line between cable systems in commonly-owned buildings and those that linked buildings owned and managed separately.  508 U.S. at 317.  First, common ownership could "be indicative of those systems for which the costs of regulation would outweigh the benefits."  *Id.*  Second, high entry costs could create a risk of monopoly power in a group of separately-owned buildings that did not exist for commonly-owned buildings.  *Id.* at 319.  Here, in contrast, nothing compels the Kentucky legislature to draw this distinction and the State has offered no basis for drawing a line between one set of community gathering centers (grocers) and all others (such as drugstores or general stores).

If grocery stores are community gathering centers in some places, they are so presumably because they sell staple groceries and other necessities that attract the wider community. However, this attribute does not distinguish them from stores currently selling wine and liquor, like Walgreens, CVS, and Rite-Aid.  Nor does it seem plausible that a rural grocery store is more or less of a community gathering place than a rural drugstore.  Drugstores also sell both staple groceries and other necessities that undoubtedly draw bibbers and teetotalers alike.  Like grocers, they do not specialize in the sale of alcoholic beverages that would attract only customers for

22

that product.

In sum, the Court finds no logical explanation for the classification of grocers as community gathering centers, but not other retailers, like drugstores.  Nor can the Court think of a rational relation between what apparently makes a store a community gathering center – substantial sales of groceries versus sales of non-food necessities – and whether that store may sell every type of alcoholic beverage, or only beer.  The State gives no plausible reason for the distinction.  The Court can only conclude that the legislature wanted to limit liquor sales generally and to maintain somewhat the status quo, and it did so by arbitrarily distinguishing grocers from all other retailers.

E.

The Court's thorough review of the statutory history does not reveal any actual stated reasons for enactment of the Statute, leaving it to speculate about the reasons.  Each of the asserted legislative aims is plainly within Kentucky's Twenty-first Amendment and inherent police powers to pursue.  *See Ohio Liquor Control*, 113 F.3d at 618.  The Court cannot say categorically that seventy years ago the legislature had some different, logical and now obscure reason for enacting the Statute.  However, the conclusion that there "were no reasons" seems to fit best.  It was, indeed, a likely compromise regarding the regulation of a controversial product.

 Perhaps back then grocers were different from other potential alcohol vendors in some manner that rationally related to the sale of liquor and wine.  If so, none of those differences appear today; most drugstores sell staples and some grocers sell prescription drugs.  *See Walgreen Co. v. City and Cnty. of San Francisco*, 110 Cal. Rptr. 498, 511-12 (Cal. Ct. App. June 8, 2010) (finding that modern, chain drugstores are similarly situated to grocers and that a

23

distinction based on whether a store primarily sells food items is irrelevant to the controlled sales of tobacco products).  Even if some facts supporting the classification may have once existed, the evolution of commerce and equal protection jurisprudence now make impermissible the Kentucky legislature's seemingly harmless arbitrary line-drawing in 1938.

The Court recognizes that legislatures "must be allowed leeway to approach a perceived problem incrementally," *Beach Commc'ns*, 508 U.S. at 316 (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955)), and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Id.* (quoting *Lee Optical*, 348 U.S. at 489).  But the record is clear that Kentucky is not engaged in one-step-at-a-time legislating.  In fact, the 74-year-old statute has become more arbitrary over time, as license-holding drugstores have become more like the grocery stores excluded from wine and liquor sales.  *See Abie State Bank v. Bryan*, 282 U.S. 765, 772 (1931) (a regulation, valid when made, may become arbitrary by reason of later events); *Louisville & Nashville R.R. Co. v. Faulkner*, 307 S.W.2d 196, 197 (Ky. 1957) ("statute valid when enacted may become invalid by change in the conditions to which it is applied") (citation omitted).

Quite obviously, rational review accords tremendous deference to legislative prerogatives and the chosen methods to achieve those prerogatives.  But deference is not an abdication of judicial review.  Requiring a rational link between the statutory classification and the legislative objective "gives substance to the Equal Protection Clause."  *Romer*, 517 U.S. at 632.  Kentucky "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *Cleburne*, 473 U.S. at 446 (citing *Zobel v. Williams*, 457 U.S. 55, 61-63 (1982)).  Here, the attenuated or non-existent relationship between

24

the Statute's classification and any number of potential legislative goals leaves the Court with no other conclusion than that the Statute offends the Equal Protection Clause and, for that reason, must be struck down as unconstitutional.

V.

Plaintiffs also challenge the Statute under the Kentucky Constitution's equal protection provisions, which "are much more detailed and specific than the Equal Protection Clause" of the Fourteenth Amendment. *Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W. 3d 408, 418 (Ky. 2005). These "provisions of the Kentucky Constitution are enhanced by Section 59 and 60," which protect against special legislation. *Id.* Because Kentucky's constitution provides "broad constitutional protection of individual rights against legislative interference," the Kentucky Supreme Court has "elected at times to apply a guarantee of individual rights in equal protection cases that is higher than the minimum guaranteed by the Federal Constitution." *Id.* (quoting *Perkins v. Northeastern Log Homes*, 808 S.W.2d 809, 818 (Ky. 1991) and citing *Tabler v. Wallace*, 704 S.W.2d 179, 187 (Ky. 1985)).

This higher standard of review requires "a 'reasonable basis' or a 'substantial and justifiable reason' for discriminatory legislation in areas of social and economic policy." *Id.* at 418-419. However, it is unclear whether the "reasonable basis" standard applies in all Kentucky equal protection cases, and if not, what factors control whether the heightened standard applies. *Compare id.* at 419 ("Cases applying the heightened standard are limited to the particular facts of those cases.") *with Lexington-Fayette Urban Cnty. Gov't v. Johnson*, 280 S.W.3d 31, 37 (Ky. 2009) (Abramson, J., dissenting) (describing "reasonable basis" requirement as "the controlling standard under Kentucky law"). The Court need not decide whether a higher standard of review

25

applies because it has concluded that the Statute lacks a rational basis, "which is sufficient to show a violation of the equal protection provisions of both Constitutions." *Elk Horn*, 163 S.W.3d at 419.

Because the Statute fails review under the Fourteenth Amendment, it likewise fails whatever review applies under the Kentucky Constitution.

VI.

Plaintiffs also vigorously argue that the Statute represents an unconstitutional delegation of state legislative power to the executive branch, *i.e.,* the Alcohol and Beverage Control Board. Because the Court has found the Statute to violate the Equal Protection Clause, it is strictly unnecessary to address this issue and it may seem counterintuitive to do so. Nonetheless, it may be helpful to a reviewing court to have this Court's view.

According to Plaintiffs, the statutory phrase "a substantial part of the commercial transaction" is so vague and overbroad as to make the phrase essentially undefined. Under Kentucky law, the legislature may not delegate the duty to define statutory terms which lack sufficient precision. *See Diemer v. Ky. Transp. Cabinet*, 786 S.W.2d 861, 864-65 (Ky. 1990); *Bd. of Trs. of the Judicial Form Ret. v. Attorney Gen. of Ky.*, 132 S.W.3d 770, 781-85 (Ky. 2003); and *TECO Mech. Contractor, Inc. v. Ky. Envtl. & Pub. Prot. Cabinet*, 366 S.W.3d 386, 397-399 (Ky. 2012).

The question of excessive legislative delegation is by its nature a controversial subject. To its credit, the Kentucky Supreme Court, in the three cases cited above and others, has set out the context and standards with consistent and admirable precision. Kentucky's constitution prohibits one branch of government from exercising the powers assigned to another. *TECO*, 366

26

S.W.3d at 397.  Kentucky strictly adheres to the separation of powers doctrine to a degree

"unsurpassed by any state in the Union."  *Judicial Form Ret.*, 132 S.W.3d at 782.

On the one hand, Kentucky recognizes that "given the realities of modern rule-making,

[the General Assembly] has neither the time nor the expertise to do it all; it must have help."

*TECO*, 366 S.W.3d at 397 (quoting *Judicial Form Ret.*, 132 S.W.3d at 781).  Nevertheless, "it is

fundamental that the legislature must prescribe some standard governing the scope of

administrative action."  *Judicial Form Ret.*, 132 S.W.3d at 783 (quoting *Keith v. Hopkins Cnty.*

*Bd. of Educ.*, 346 S.W.2d 737, 741 (1961)).

The particular statute at issue here presents a close call.  The *Diemer* case presents this

Court with the closest possible analogy.  That case concerned the term "urban area" in the

Kentucky Billboard Act, Ky. Rev. Stat. §§ 177.830(10) and 177.841(2), which purported to

define the geographic limits of the Act's prohibitions.  Kentucky's Secretary of Transportation

subsequently issued regulations defining "urban area" precisely as the term was used in federal

regulations.  The Kentucky Supreme Court concluded that the statutory term was

unconstitutionally vague and the grant of discretion to the Secretary of Transportation to define

it was an impermissible delegation of the legislative function.  *Diemer*, 786 S.W.2d at 866.

Plaintiffs make a strong argument that the term "urban area" is no more vague than "a

substantial part of the commercial transaction."   Consequently, they contend, the *Diemer*

precedent governs this case.  The Court certainly would respect any other court which might

agree.  The Court concludes, however, that a few differences suggest that the Statute here was

not so vague and its delegation not so excessive.

First, the Court finds that the term "of the commercial transaction" can only mean some

27

reasonable measure of a store's gross revenues from the applicable products.  It seems hardly excessive that the Alcohol and Beverage Control Board might write a regulation to define how those computations are to be made.

The more difficult question is whether the term "substantial" sufficiently suggests an intent and standard that is not constitutionally vague.  At the least, the term is an adjective suggesting an intent and a standard.  The term would seem to limit the Statute's operation in a manner more definite than the noun "urban area."  If not, then does the separation of powers doctrine require the legislature to specify an exact percentage of gross sales that differentiates those allowed to sell spirits and those not?  The Court thinks not.

Finally, the *Diemer* court noted the unusually "broad discretion" granted to "use any definition [the Secretary of Transportation] might choose" to craft a definition of "urban area." *Id.* at 865.  It said that the General Assembly had "abdicated its legislative power by such a delegation."  *Id.* at 866.  Here, the Statute does not contain such an unusual delegation nor one that could be similarly characterized.  Moreover, the Alcohol Beverage Control Board has decades of experience regulating the stores that sell all types of alcoholic beverages.  *See TECO*, 366 S.W.3d at 398.

For these reasons, the Court concludes that (1) the term "substantial" suggests a limiting standard different from the term "urban area;" and (2) the discretion of the Alcohol Beverage Control Board to draft regulations is no different than any other agency.  Accordingly, the Court concludes, that should the Statute pass constitutional muster under the Fourteenth Amendment, it is not invalid due to an unconstitutional delegation of legislative authority.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record